CORALEE KERN, d/b/a Maid to Order, *et al.*, Plaintiffs-Appellants, v. WKQX RADIO *et al.*, Defendants-Appellees.

First District (3rd Division)   No. 87—2718

Opinion filed October 12, 1988.

Richard H. Kane, of Chicago, for appellants.

Bergstrom, Davis & Teeple, of Chicago (Robert W. Bergstrom, Ronald W. Teeple, and John L. Leonard, of counsel), for appellees.

JUSTICE FREEMAN delivered the opinion of the court:

Plaintiffs, Coralee Kern, d/b/a Maid To Order, and Maid To Order, Inc., appeal the trial court's denial of their petition for a temporary injunction seeking to restrain defendants from distributing, showing, or advertising a motion picture entitled Maid To Order. The trial court denied the injunction with regard to counts I, I, and III of plaintiffs' second amended complaint. On appeal plaintiffs contend that the trial court abused its discretion in denying their petition for injunctive relief regarding counts I and II only. Count I seeks injunctive relief under the Illinois trademark act (Ill. Rev. Stat. 1987, ch. 140, par. 22), commonly known as the Anti-Dilution Act. Count II seeks injunctive relief for trademark infringement and also cites the Illinois Anti-Dilution Act.

For the reasons stated below, we affirm the judgment of the circuit court.

Plaintiffs' second amended complaint alleges that plaintiff Kern has been doing business since September 1971 under the name "Maid

to Order" in the Chicago metropolitan area, the State of Illinois, and the States of Wisconsin and Indiana, as a maid service providing cleaning services for domestic and business premises. Maid To Order, Inc., initially was incorporated under the laws of Illinois in September 1971 and was reincorporated on July 19, 1987. Since 1971, plaintiff allegedly has expended substantial sums of time and money advertising "Maid To Order" as a trade name. Consequently, the name allegedly has achieved significant recognition in the mind of the general public in Illinois, and the name generally has become associated by the general public with plaintiff's maid service business. Further, during the course of operation of her business, plaintiff allegedly enjoyed virtually exclusive use of the name "Maid To Order" in the Chicago metropolitan area and the State of Illinois.

Plaintiff applied to the United States Patent and Trademark Office for a service mark under the name "Maid To Order" and received a certificate of registration on May 26, 1981. The service mark was registered pursuant to the Trademark Act of 1946 (15 U.S.C. §1051 *et seq.* (1982)), commonly known as the Lanham Act. Further, in mid-1986, plaintiff filed an affidavit with the United States Patent and Trademark Office showing that the mark was still in use and that plaintiff was "entitled to continue said mark."

In or about June 1987, defendants, New Century/Vista Film Company (New Century) and the Vista Organization Partnership (Vista), allegedly entered into contracts with movie theaters in the Chicago metropolitan area and the State of Illinois pursuant to which defendants agreed to distribute a motion picture entitled Maid To Order. The motion picture deals with the subject matter of the maid service industry and in particular with the cleaning of domestic premises. In June 1987, counsel for plaintiffs notified defendants of plaintiffs' entitlement for the exclusive use of the name "Maid To Order" and plaintiffs' contention that the story line of Maid To Order was derogatory and injurious to plaintiffs' reputation and business.

Count I of the complaint cites section 15 of the Illinois Anti-Dilution Act (Ill. Rev. Stat. 1987, ch. 140, par. 22), which provides for injunctive relief under certain circumstances against the use of the same or a similar trademark. Count I alleges that on June 20, 1987, defendants New Century and Vista caused to be published in Time magazine an advertisement for Maid To Order which allegedly states, in part, "worse help is hard to find. Maid To Order." Further, plaintiffs allege that the film depicts the actress playing the role of domestic maid in nude scenes and otherwise detracts from the integrity of the maid service profession by depicting the profession in a nonprofessional light.

Count I further alleges that if defendants are allowed to distribute the film in Illinois, plaintiffs will suffer irreparable injury in that the advertising and story line of the film are likely to cause substantial injury to the plaintiffs' business reputation. In addition defendants' use of the name "Maid To Order" allegedly will cause substantial dilution of the distinctive quality of plaintiffs' trade name. Plaintiffs allege that they have no adequate remedy at law and seek injunctive relief restraining defendants from distributing, showing, or offering to show or advertising the film Maid To Order in the State of Illinois.

Count II of the complaint is entitled "Trademark Infringement," and also cites section 15 of the Illinois Anti-Dilution Act (Ill. Rev. Stat. 1987, ch. 140, par. 22). Count II alleges that since at least early June 1987, defendants have advertised the film Maid To Order in local and national publications, including Time, People, and Newsweek magazines, and have made use of the name "Maid To Order" in derogation of the rights of plaintiffs pursuant to their registered trade name. Further, plaintiffs allege that by utilizing the name "Maid To Order" in derogation of plaintiffs' exclusive right to the use of the name in Illinois, defendants will garner substantial profits which otherwise would accrue to the benefit of plaintiffs. Count II seeks injunctive relief restraining defendants from distributing, showing, offering to show, or advertising the film Maid To Order in Illinois.

A hearing on plaintiffs' petition for preliminary injunction was held on July 29 and 30, 1987. Several witnesses testified on behalf of plaintiffs. Philip Kemp, assistant professor of marketing at DePaul University, testified that he met plaintiff Kern at a business meeting in around 1982. Kemp is familiar with Maid To Order, Inc., and has visited the business on numerous occasions in order to discuss with Kern the functioning and marketing of a "home-based" business like Kern's. Kemp was not aware of anyone besides plaintiff using the name "Maid To Order."

Kemp described a television advertisement for Maid To Order which he saw several days before he testified as showing "a very scatterbrained, hairbrained individual running around at home, a luxurious home, that did not appear to know what they were doing, destroying, being destructive, and just chaos." Kemp also described an advertisement for the film appearing in the July 20, 1987, issue of Time magazine. The magazine advertisement showed a person in maid garb "who is being served by her clientele rather than servicing them." Kemp gave his opinion that the advertisement is detrimental to plaintiff's business; dilutes plaintiffs' trade name in the business community where the business operates; and has a possible adverse

effect on future business which plaintiffs may obtain. Kemp believed that the advertisement dilutes the type of services plaintiff Kern is attempting to present to "her" public. Kemp bases his opinion on Kern's having established her business in the maid cleaning service in the Chicagoland area as a quality maid cleaning service that people can trust and rely upon when they seek maid cleaning services. Kemp believed that the advertisement would adversely affect Kern's marketing capabilities in that the advertisement states that "worse help is hard to find." The adverse impact upon plaintiff's business is a possible dilution of the opinion of plaintiff's current clients regarding the service plaintiff provides. Further, potential clients may associate the advertisement to the type of service plaintiff provides.

On cross-examination, Kemp admitted that he had not seen the film Maid To Order, nor did he request to view it, even though he was aware that the film was made available to plaintiffs' counsel. When asked regarding a statement in the Time magazine advertisement which read "Ally Sheedy is Jessie Montgomery," Kemp stated that he did not know who Ally Sheedy was, or that she was an actress, or who Jessie Montgomery was. Nor, Kemp stated, did he attempt to find out who the named people were. Counsel for defendants asked Kemp to read from the Oxford American Dictionary the definition of "made-to-order." The definition provides, "made according to specific instructions." Kemp stated his awareness of the use of the phrase in connection with clothes and shoes—for instance, made-to-order shoes, made-to-order dresses, made-to-order suits. Counsel for defendant also asked Kemp that assuming that Maid To Order is not derogatory to the professional maid cleaning industry, and after being shown, the film receives favorable reviews from the press and public, whether plaintiff's company, Maid To Order, Inc., would be injured by the fact that the film bears the title Maid To Order. Kemp responded, "No."

On redirect examination, plaintiffs' counsel questioned Kemp regarding specific scenes in the film. Counsel asked Kemp whether, if, for instance, the film depicted a maid throwing away an ashtray rather than cleaning out some gum left in it, such a depiction would be derogatory to the maid industry in general and to plaintiff's business in particular. Kemp stated that it would. Further, Kemp believed that a depiction of a maid flooding the kitchen floor with suds from laundry detergent she mistakenly put in the dishwasher would also be derogatory to the maid industry generally and to plaintiff's business.

Plaintiff, Coralee Kern, testified that her company, Maid To Order, Inc., serves people in private homes, apartments, and small offices, and does special cleaning jobs. The company employs approxi-

mately 40 regular employees and 10 to 12 others who are on call. The company serves the metropolitan Chicago area, including Cook, Lake, Kane, McHenry, Du Page, and Will Counties.

Plaintiff has promoted the business in several ways. When the business first began, Kern devised blue chips which she sent out in a mailing to people in the Chicago area, and referred to her business as the maid service "Maid To Order, your blue chip maid service." Kern regularly has advertised in local suburban newspapers, the Chicago Tribune and Sun-Times, and in the Yellow Pages telephone directory. Occasionally, she has advertised in suburban telephone directories. Kern purchased $3,000 in coupon advertising for the business. In addition, Kern has appeared on television programs such as "Good Morning America," "Nightline," the "Oprah Winfrey Show," "Donahue," the "700 Club," and "Hour Magazine" in order to discuss the nature of her company's services. Whenever she appeared on television, plaintiff "always" discussed the name "Maid To Order." The trial court was shown a brief videotape of one or more of Kern's appearances on television.

Kern stated that if she became aware that other companies across the country were named "Maid To Order," she would ask them to cease using the name. When traveling to different parts of the country, Kern checked the Yellow Pages of certain communities in order to discover if there were any companies carrying the name. If she found any companies bearing that name, she would contact those businesses. In or around 1985, Kern wrote to every secretary of State across the country in order to obtain the names of anyone who had incorporated the name "Maid To Order," and Kern sent letters to those companies. Kern stated that since the business began in 1971, the cost of advertising, marketing, and public relations promotion has exceeded $200,000.

Plaintiff registered the company's name with the United States Trademark and Patent Office in 1981. Kern stated that other than her son, who has a business called "Maid To Order Custom Cleaning," she is unaware of any businesses in Illinois that have the name "Maid To Order." Kern stated that she gave her son permission to use the name "Maid To Order."

Kern first became aware of the film Maid To Order in the spring of 1987 when someone she knew told her that the movie was to be shown and when Kern saw a magazine article stating that Ally Sheedy was to appear in a film with that title. Kern hired a clipping service to provide her with more information regarding the film, and she received clippings in June and July 1987. Kern later saw the film.

The aspects of the film Kern found objectionable were: (1) the maid did not fill out an application when she applied for the job; (2) the film stated that there were no white maids; (3) there was cursing by the characters; (4) and the maid spilled soda on a pillow and then turned it over; threw away an ashtray rather than cleaning it; and caused a vacuum cleaner to blow up. Kern found these aspects of the film objectionable because they depicted a service unlike that which her business provides, in that, for instance, Kern interviews numbers of people before hiring anyone and has "built her business on" working with ethnic and minority women.

Kern stated that she received letters and otherwise learned that her clients believed that the movie was derogatory to her business. Some stated that they believed the movie was against homemaking as a profession, and others stated that they were sorry to see the adverse impact on Kern's business, since Kern had worked to develop a professional service for the maids.

Kern was asked regarding the impact on her business of the advertisement in Time magazine and other national publications, which allegedly contained the words, "Maid To Order, Worse help is hard to find." Kern believed that the advertisements would lead people who, within a year in the future, wish to hire a maid service, to contact a service other than Maid To Order, Inc., since they will have the objectionable phrase, "Maid To Order, Worse help is hard to find," in their subconscious.

Kern testified that the average yearly gross income of her business is approximately $200,000, with a maximum income in one year of approximately $500,000. Since Kern began her business, several people have inquired about purchasing the business and purchasing or franchising the name "Maid To Order." Kern stated that profits from the business in 1986 amounted to $40,000.

Carol Seelig testified that she became familiar with plaintiff and her company in 1984 when Seelig attended an Illinois conference on small businesses. Seelig later engaged plaintiff's company to provide cleaning services at her home. Seelig decided to hire plaintiff's company based on the company's reputation for providing good quality cleaning service and for its reputable, trustworthy employees. Further, Seelig became aware that Kern "stood behind her people." As of the date of the hearing, Seelig continued to use the services of Maid To Order, Inc.

Joanne Moss, owner and operator of the maid service business Mighty Maids for six years, testified that she has been familiar with the reputation of plaintiff's business since before she began her own

company. Moss believes that plaintiff's company is the "forerunner of maid service in Chicago." Moss stated her opinion that an advertisement stating, "Maid To Order, Worse help is hard to find," would demean the cleaning service.

Yocheved Ellis, owner of the cleaning service Team Clean, Inc., for 10 years, testified that she has been familiar with plaintiff's business for eight to nine years. She believes that plaintiff's company is well known and very highly regarded by the public. When Ellis saw a television commercial advertising the film Maid To Order, she associated the film with plaintiff's business.

Mark Heaney, general manager for the maid service company McMaid, Inc., for 2½ years, testified that plaintiff's company "has an excellent reputation and has been a leader in the local market for quite a while." Further, Kern is well known as the proprietor of Maid To Order, Inc. Heaney stated that McMaid, Inc., considered purchasing plaintiff's company. Heaney gave his opinion that the name "Maid To Order," as the name of plaintiff's company, would be adversely affected and the value would be diminished by the depiction, in a film of the same name, of a maid doing a very poor job of cleaning.

On cross-examination, Heaney admitted that he has not seen Maid To Order. Heaney also stated, however, that his opinion would not change if he saw the film. Heaney admitted that, while his company considered buying plaintiff's company, McMaid, Inc., never discussed prices, and has no information regarding earnings, sales, or other financial data regarding plaintiff's company. On redirect examination, Heaney stated that his opinion regarding the value of plaintiff's company was based on the reputation of the company, the company name, and Kern.

At the end of plaintiffs' case, defendants moved for a directed verdict, and the trial court granted a directed verdict regarding counts I, II, and III of plaintiffs' second amended complaint. The trial court found that the scenes in the film which allegedly depicted the maid's "gross incompetence," including the ashtray scene and the vacuum cleaner scene, were consecutive and lasted a total of approximately 2 minutes, 20 seconds of the 92½-minute-long film. The court stated that other scenes in the film may have shown the maid to be incompetent, but the highly intense scenes that occurred one upon the other lasted only 3% of the film's total time. Further, those scenes pertained only to the one maid in the film, the so-called star, while the other household help were portrayed in a competent manner. In addition, the court stated that those scenes depicting the leading role were "so grossly exaggerated that they amounted to comedic or slap-

stick humor. And no one in the Court's opinion would seriously suggest that anyone would ever work for a company that possessed those poor skills." The court stated that the maid was portrayed also as having many good personality traits. At the end of the film, she was portrayed as a competent maid. The "nude scenes" referenced in plaintiffs' complaint consisted of two very brief, very mild segments and were not, in the court's opinion, derogatory of maid services in general.

The trial court found no clear right to the broad injunctive relief—of enjoining the showing of the film—sought by plaintiffs in counts I and II of the complaint. The court stated that plaintiffs had an opportunity, six to nine weeks before they did, to file suit and to fashion a more narrow scope of relief. Instead, plaintiffs waited until nine days before the film was scheduled to be shown. The court found that plaintiff Kern was sophisticated enough that she could have been more diligent in seeking injunctive relief sooner. Further, the court found that the evidence of irreparable harm to plaintiff's business was not strong enough to survive a directed finding against plaintiffs at the close of plaintiffs' case.

Finally, the court found that the mark "Maid To Order" as the name of plaintiff's business does not have such characteristics that are so distinctive as to bring it within case law protecting distinctive marks. The court stated that plaintiff's company name is a generic or descriptive mark and describes the services performed. Further, the court found that the mark was the least strong mark among trademarks.

■ Plaintiffs contend on appeal that the trial court abused its discretion in denying their petition for a preliminary injunction. In order to obtain an injunction, a party must show an ascertained right in need of protection, a likelihood of success on the merits, an inadequate remedy at law, and irreparable injury. (*Witter v. Buchanan* (1985), 132 Ill. App. 3d 273, 476 N.E.2d 1123; *People ex rel. Edgar v. Miller* (1982), 110 Ill. App. 3d 264, 269, 441 N.E.2d 1328.) The decision to grant or deny a preliminary injunction is within the discretion of the trial court, and the trial court's decision will not be disturbed on appeal absent an abuse of discretion. (*Lonergan v. Crucible Steel Co.* (1967), 37 Ill. 2d 599, 612, 229 N.E.2d 536.) The trial court has the duty to determine whether the plaintiffs have established a *prima facie* case that there is a fair question as to their entitlement to preliminary relief. (*Witter v. Buchanan*, 132 Ill. App. 3d at 279.) The court in *Newco Laundromat Co. v. ALD, Inc.* (1958), 16 Ill. App. 2d 494, 148 N.E.2d 820, stated that "[t]he propriety of granting a tempo-

rary injunction depends on the facts of each particular case and the general principles of equity as relating to injunctions, and the right to exercise common sense in the granting or refusing of injunctions is one of the fundamental prerogatives of a court of chancery." (*Newco Laundromat Co.*, 16 Ill. App. 2d at 499.) In *Dixon Association for Retarded Citizens v. Thompson* (1982), 91 Ill. 2d 518, 440 N.E.2d 117, the supreme court quoted *City of Chicago v. Airline Canteen Service, Inc.* (1978), 64 Ill. App. 3d 417, 380 N.E.2d 1106, where the appellate court stated:

> "In reviewing the discretion exercised by the trial court, an appellate court may decide only whether the petitioner has demonstrated a *prima facie* case that there is a fair question as to the existence of the rights claimed; that the circumstances lead to a reasonable belief that they probably will be entitled to the relief sought, if the evidence sustains the allegations of the petition; and that matters should be kept in *status quo* until the case can be decided on its merits. In sum, the only question before us is whether there was a sufficient showing to sustain the order of the trial court." *Airline Canteen Service, Inc.*, 64 Ill. App. 3d at 432-33.

■ Plaintiffs contend that their business name "Maid To Order" is entitled to protection under trademark law. The categories for terms which are claimed to have trademark protection are: (1) generic or common descriptive; (2) merely descriptive; (3) suggestive; and (4) arbitrary or fanciful. (*Miller Brewing Co. v. G. Heileman Brewing Co.* (7th Cir. 1977), 561 F.2d 75, 79, *cert. denied* (1978), 434 U.S. 1025, 54 L. Ed. 2d 772, 98 S. Ct. 751.) A generic term is one commonly used as the name or description of a kind of goods. It cannot become a trademark under any circumstances. (*William R. Warner & Co. v. Eli Lilly & Co.* (1924), 265 U.S. 526, 528, 68 L. Ed. 1161, 1163, 44 S. Ct. 615, 616.) A merely descriptive term specifically describes a characteristic or ingredient of an article. It can, by acquiring a secondary meaning, *i.e.*, becoming "distinctive of the applicant's goods" (15 U.S.C. §1052(f) (1982)), become a valid trademark. *Miller Brewing Co.*, 561 F.2d at 79, citing *Abercrombie & Fitch Co. v. Hunting World, Inc.* (2d Cir. 1976), 537 F.2d 4, 10.

■ A suggestive term suggests rather than describes a characteristic of the goods and requires the observer to use imagination and perception to determine the nature of the goods. Such a term can be protected without proof of a secondary meaning. (*Miller Brewing Co.*, 561 F.2d at 79, citing *Abercrombie & Fitch Co.*, 537 F.2d at 11.) An arbitrary or fanciful term has the same full protection as a suggestive

term but is far enough removed from the merely descriptive not to be vulnerable to possible attack as being merely descriptive rather than suggestive. *Miller Brewing Co.*, 561 F.2d at 79, citing *Abercrombie & Fitch Co.*, 537 F.2d at 11.

In both counts I and II of their complaint, plaintiffs cite section 15 of the Illinois Anti-Dilution Act (Ill. Rev. Stat. 1987, ch. 140, par. 22), which provides in pertinent part:

"Every person *** adopting and using a mark, trade name, label or form of advertisement may proceed by suit, and the circuit court shall grant injunctions, to enjoin subsequent use by another of the same or any similar mark, trade name, label or form of advertisement if there exists a likelihood of injury to business reputation or of dilution of the distinctive quality of the mark, trade name, label, or form of advertisement of the prior user, notwithstanding the absence of competition between the parties or of confusion as the source of goods or services *** "

■ The Anti-Dilution Act is designed to protect a strong trade name or mark from use by another and thus against dilution regardless of competition between the parties. (See *Filter Dynamics International, Inc. v. Astron Battery, Inc.* (1974), 19 Ill. App. 3d 299, 314, 311 N.E.2d 386; *Alberto-Culver Co. v. Andra Dumon, Inc.* (7th Cir. 1972), 466 F.2d 705, 709.) The court in *Ye Olde Tavern Cheese Products, Inc. v. Planters Peanuts Division, Standard Brands Inc.* (N.D. Ill. 1966), 261 F. Supp. 200, *aff'd* (7th Cir. 1967), 394 F.2d 833, stated that the Illinois trademark act requires that the trademark or name be "distinctive." Further, the court stated that cases interpreting this requirement have limited relief to situations where the name was original with the plaintiff, where it acquired widespread reputation and good will through the plaintiff's efforts, and where the defendant's name or mark was virtually identical.

Plaintiffs in the instant case assert that under section 15 of the Anti-Dilution Act (Ill. Rev. Stat. 1987, ch. 140, par. 22) they were entitled to injunctive relief. Plaintiffs contend that the evidence indicates a likelihood of injury to plaintiffs' business reputation resulting from the derogatory manner in which defendants used plaintiffs' mark in the film and in advertising. In addition, plaintiffs contend that there was no evidence to rebut the *"prima facie* presumption of the validity of plaintiffs' trademark, but also the *conclusive presumption* of the incontestibility [*sic*] of the mark." (Emphasis in original.) Plaintiffs point to the registration of the mark pursuant to the Lanham Act (15 U.S.C. §1115 (1982)) and the filing of their incontest-

ability affidavit.

Plaintiffs also assert that the evidence indicates that they continuously have used the mark "Maid To Order" from September 1971 until the date of filing of their petition for injunctive relief. Further, plaintiffs assert that the testimony at the hearing established a secondary meaning to the name "Maid To Order" in that consumers and customers associated plaintiff's business and reputation with the name. Such evidence, plaintiffs assert, indicates that the name is not generic or merely descriptive of the services provided by the company, contrary to the finding by the trial court. Plaintiffs contend that the trial court confused the distinction between generic and descriptive trademarks.

We look to the analysis set forth in *Ye Olde Tavern Cheese Products, Inc. v. Planters Peanuts Division, Standard Brands, Inc.* (N.D. Ill. 1966), 261 F. Supp. 200, *aff'd* (7th Cir. 1967), 394 F.2d 833, in determining whether the trade name in the instant case is "distinctive" within the meaning of the Illinois Anti-Dilution Act (Ill. Rev. Stat. 1987, ch. 140, par. 22). A name is distinctive if the following three factors are met: (1) the name was original with the plaintiff; (2) the name acquired widespread reputation and goodwill through the plaintiff's efforts; and (3) the defendant's name or mark was virtually identical. *Ye Olde Tavern Cheese Products, Inc.*, 261 F. Supp. at 208.

We find that only two of the three factors are met in the instant case. First, the name of the film and the name of plaintiff's business are virtually identical. The names are spelled the same. The names differ perhaps only in the type of lettering used or the logo accompanying the name. Second, plaintiffs presented at least some evidence that the name of their business acquired a reputation and goodwill. With regard to the third factors, however, plaintiffs failed to show that they originated the name "Maid To Order," which they seek to protect. Plaintiff Kern indicated that she became aware of other businesses which carried the name. Further, in response to a request by defendants' counsel, plaintiffs' witness Philip Kemp read into the record the dictionary definition of the adjective "made-to-order." Further, Kemp admitted that the term "made-to-order" is commonly used, for instance, in the clothing industry. The name "Maid To Order" is a variation of the common phrase "made-to-order." The difference in spelling alone does not provide protection. Using the phonetic equivalent of a common descriptive word, *i.e.*, misspelling it, fails to give the word trademark protection. (*Miller Brewing Co. v. G. Heileman Brewing Co.* (7th Cir. 1977), 561 F.2d 75, *cert. denied* (1978), 434 U.S. 1025, 54 L. Ed. 2d 772, 98 S. Ct. 751.) Therefore, we do not find

that the trial court abused its discretion in denying the injunctive relief sought, as plaintiffs failed to show that their trade name was protected. See *Miller Brewing Co.*, 561 F.2d at 81; *Victory Pipe Craftsmen, Inc. v. Faberge, Inc.* (N.D. Ill. 1984), 582 F. Supp. 551.

■ Even assuming *arguendo* that plaintiffs' name is distinctive, we find that the possibility or probability that defendants' use of "Maid To Order" as the title of the film would cause the general public or the plaintiffs' current or potential clients to equate the portrayal of the maid in the movie with the quality of the services provided by plaintiffs to be very slight. We agree with the trial court that the subject matter of the film was not shown to be derogatory to plaintiffs' business so as to result in harm justifying the issuance of an injunction against the showing of the film in Illinois.

Federal law supports the result reached by the trial court. Paragraph 1115(a) of the Lanham Act (Act) (15 U.S.C. §1115(a) (1982)) provides that registration under the Act is *"prima facie* evidence of registrant's exclusive right to use the registered mark in commerce *on the goods or services specified in the registration."* The Act is designed to protect a prior user from use by a subsequent user who sells products or services which are in competition with those of the prior user. (*Avon Shoe Co. v. David Crystal, Inc.* (2d Cir. 1960), 279 F.2d 607, *cert. denied* (1960), 364 U.S. 909, 5 L. Ed. 2d 224, 81 S. Ct. 271.) We find that the Act does not encompass the situation presented in the instant appeal. We have found that the likelihood that the public would ascribe the qualities of the maid portrayed in the film to plaintiffs' services to be remote. The film and plaintiffs' business are non-competitors whose businesses offer goods or services which are completely different from one another. Therefore, the trial court acted properly in determining that plaintiffs failed to show irreparable harm resulting from defendants' use of the name "Maid To Order" such that plaintiffs were entitled to the injunction sought. *Witter v. Buchanan* (1985), 132 Ill. App. 3d 273, 476 N.E.2d 1123.

Plaintiffs also assert that a finding by the trial court regarding the actress who played the role of the maid in the film should not bear on their claim. Plaintiffs point to a comment by the trial court where the court presented a hypothetical situation. The court stated that plaintiffs were attempting to assert that even if, for instance, Mother Teresa was the maid in the film, the film still would be harmful to plaintiffs' business, merely because of the name of the film. The trial court found that the basis of plaintiffs' assertion regarding harm resulting from the title of the film itself lacked validity.

■ We note that the trial court's comment came in the context of

the court's review of the evidence of irreparable harm to plaintiffs, particularly the testimony of plaintiffs' witness Mark Heaney. The trial court found Heaney's testimony that certain scenes in the film would disparage plaintiffs' business was not credible or persuasive, in light of the fact, among other things, that Heaney had not seen the film. We hold that the trial court's comment reflected the trial court's proper consideration of the potential effect of the film title upon plaintiff's business.

Plaintiffs also assert that the trial court had the authority to "custom-make" some form of relief that would not be too harmful to defendants while being beneficial to plaintiffs. Plaintiffs assert that the material part of their complaint was not that the film was being released, but rather that defendants wrongfully appropriated plaintiffs' service mark and were using the mark in derogation of plaintiffs' rights. Plaintiffs contend that the trial court could have granted relief which would have precluded defendants from utilizing plaintiffs' service mark while also affording defendants the opportunity to release the film under another title. Plaintiffs contend that defendants had been aware for six weeks of plaintiffs' claim, and any inconvenience to them of selecting another title for the film is not grounds for denial of injunctive relief in favor of plaintiffs.

■ While in a proper case a court of equity may fashion alternative or additional equitable relief (see *La Cost v. Mailloux* (1948), 401 Ill. 283, 81 N.E.2d 920), such authority may be subject to abuse and so must be carefully guarded (see *DeMarco v. University of Health Sciences/Chicago Medical School* (1976), 40 Ill. App. 3d 474, 352 N.E.2d 356). In the instant case plaintiffs assert that the trial court could have fashioned narrower relief than that which plaintiffs requested in their prayer for relief. However, plaintiffs failed in the trial court to seek such alternative relief. Under the circumstances, we do not think the trial court committed error. We cannot impose upon the trial court a duty which properly falls on the party seeking equitable relief, that is, to request of the court the kind and scope of relief which the party seeks in its action.

For the reasons stated below, we affirm the judgment of the circuit court.

Judgment affirmed.

McNAMARA and RIZZI, JJ., concur.