**The COCA–COLA COMPANY, a corporation, Plaintiff,**

v.

**ALMA–LEO U.S.A., INC., Defendant.**

**No. 89 C 6045.**

United States District Court,
N.D. Illinois, E.D.

Aug. 17, 1989.

---

Dean A. Olds, Jeffrey A. Handelman, Willian Brinks Olds Hofer Gilson & Lione, Chicago, Ill., James A. Johnson, The Coca–Cola Co., Atlanta, Ga., for plaintiff.

Floyd A. Mandell, Katten Muchin & Zavis, Chicago, Ill., for defendant.

### MEMORANDUM AND ORDER

MORAN, District Judge.

Plaintiff, The Coca–Cola Company (Coca–Cola), brings suit against defendant, Alma–Leo U.S.A., Inc. (Alma–Leo), alleging various claims for relief stemming from the latter's marketing and selling of a bubble gum product entitled "Mad Scientist Magic Powder" (Magic Powder). The gum comes in the form of a white powder and, as we describe *infra*, is sold in a plastic container resembling a Coca–Cola bottle. We here evaluate Coca–Cola's motion for a temporary restraining order (TRO) enjoining disposition of the current Magic Powder inventory as, *inter alia*, violating and diluting Coca–Cola's trademarks governing their soft drink bottles.[1] For the following reasons, we grant that motion.

In its six-count complaint Coca–Cola alleges violations of the Federal Trademark Act (count I), the Illinois Anti–Dilution Act (count IV), the Illinois Uniform Deceptive Trade Practices Act (count V), and the Illinois Consumer Fraud and Deceptive Business Practices Act (count VI). It further claims relief based on both federal and common law unfair competition grounds (counts II and III respectively). Because we find a violation of the Illinois Anti–Dilution Act so likely, we need not discuss the complaint's other counts to predict likely success on the merits.

### I. *TRO Standards*

The motion at bar, while labeled a request for a TRO, more closely resembles a motion for a preliminary injunction. The former term usually attaches to a request for relief *ex parte.* In recognition thereof, Rule 65 provides explicit durational limits and various requirements respecting attorney representations. Here, however, counsel for Alma–Leo have been amply notified of this litigation and have submitted a 13-page response, supplemental pleadings and memoranda, and various supporting exhibits (some written, some edible). In such circumstances we choose to apply the traditional standards governing preliminary injunctions. *See* 11 Wright & Miller, Federal Practice and Procedure: Civil § 2951, at 499 (1973) ("When the opposing party actually receives notice of the application for a restraining order, the procedure that is followed does not differ functionally from that on an application for a preliminary

---

1. *See* exhibits in support of Coca–Cola Company's request for a temporary restraining order.

injunction and the proceeding is not subject to any special requirements"). Nonetheless, this order will remain in effect only until a hearing can be had, and having scheduled it "at the earliest possible time," *cf.* Rule 65(b), we therefore limit the term of this order to twenty days.[2]

We therefore evaluate, in order, the likelihood of success on the merits, the threat of irreparable injury, the balance of harms, and the public interest at issue. We do so within the "sliding scale" framework established by Judge Posner in *Roland Machinery Co. v. Dresser Industries*, 749 F.2d 380 (7th Cir.1984). That opinion noted the interrelationship between the above purportedly independent demonstrations and, in relevant part, held:

> 5. If the plaintiff does show some likelihood of success, the court must then determine how likely that success is, because this affects the balance of relative harms (point 3 above). The more likely the plaintiff is to win, the less likely need the balance of harms weigh in his favor, the less likely he is to win, the more need it weigh in his favor. This is a most important principle, and one well supported by cases in this and other circuits, and by scholarly commentary.

*Id.* at 387 (citations omitted). This court has wholeheartedly embraced the "sliding scale" approach elsewhere, most recently in *Dobson, et al. v. Chicago and Northeast Illinois District, United Brotherhood of Carpenters, et al.,* 707 F.Supp. 348 (N.D. Ill.1989), and we apply that analysis here.

II. *Success on the Merits*

The Illinois Anti–Dilution statute explicitly affords potential plaintiffs injunctive relief. In relevant part, that statute provides:

> 22. Injunction against use of same or similar trademark, trade name, label, etc.
>
> § 15. Every person, association, or union of working men adopting and using a mark, trade name, label or form of advertisement may proceed by suit, and the circuit court shall grant

injunctions, to enjoin subsequent use by another of the same or any similar mark, trade name, label or form of advertisement. If there exists a likelihood of injury to business reputation or of dilution of the distinctive quality of the mark, trade name, label or form of advertisement of the prior user, notwithstanding the absence of competition between the parties or of confusion as to the source of goods or services.

Ill.Rev.Stat. ch. 140, ¶ 22. An injunction *"must* be granted if the prior user can show that the mark is distinctive and that the subsequent user's use dilutes that distinctiveness." *Hyatt Corp. v. Hyatt Legal Services,* 736 F.2d 1153, 1157 (7th Cir.), *cert. denied,* 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 361 (1984) (emphasis added). The scope of that provision addresses several of Alma–Leo's objections. The prohibition extends protection respecting even non-competitors, and targets dilution of existing marks, not confusion of those marks with others. *Hyatt Corp.,* 736 F.2d at 1157. Since Alma–Leo does not dispute Coca–Cola's prior use, we evaluate the Anti–Dilution Act's two criteria.

We hold initially that the mark is distinctive. To be so considered, a mark must have come to be identified with its owner and its owner's products or services. *Universal City Studios, Inc. v. Montgomery Ward & Co., Inc.,* 207 U.S.P.Q. 852, 858 (N.D.Ill.1980). Relevant factors to be evaluated include the commonness of the mark, the length of time the mark has been used, the scope of advertising and promotion, the nature and extent of the business and the scope of the first user's reputation. *Hyatt Corp.,* 736 F.2d at 1158. Generally, "distinctiveness will only be found where the work has acquired a widespread reputation and good will through plaintiff's efforts." *Ye Olde Tavern Cheese Products, Inc. v. Planters, Peanuts Division, Standard Brands, Inc.,* 261 F.Supp. 200, 208 (N.D.Ill.1966), *aff'd* 394

---

**2.** Having neither made our decision *ex parte,* nor after a hearing, we adopt the term of Rule 65(b) (doubling of the ten-day period), even though that provision technically limits only the terms of TROs granted "without notice."

F.2d 833 (7th Cir.1967). *See also Kern v. WKQX Radio*, 175 Ill.App.3d 624, 635, 529 N.E.2d 1149, 1156, 125 Ill.Dec. 73, 80 (1st Dist.1988).

■ Easy application of these factors renders Coca–Cola's mark distinctive within the meaning of the Illinois Anti–Dilution law. Consumers certainly identify the Coca–Cola bottle with the company and its soft drink. The bottle mark is quite common and one which has been used for decades. Coca–Cola spends considerable sums advertising and promoting its product to further enhance its already extensive reputation. Put succinctly, Coca–Cola's bottle represents the archetypical distinctive mark.

We further believe that Alma–Leo's use dilutes the distinctiveness of the Coca–Cola bottle. The Magic Powder container closely resembles the Coca–Cola mark. The contours mirror each other: both have circular bottoms that narrow at the container's one-quarter point, then expand at the center to a circumference similar to that of the base (an hourglass configuration), maintain that shape for a time (bordered by separate indentations), and finally narrow to a cap covering the container's top. Magic Powder's plastic container even contains vertical lines covering the length of the bottle. Those physical resemblances sufficiently demonstrate the requisite dilution without ever inquiring into whether individuals might believe that Alma–Leo's product originated from or was sponsored by Coca–Cola.

Alma–Leo alleges its product also resembles other products in the existing marketplace. First, the similarity between Alma–Leo's container and Coca–Cola's mark is striking. Further, that other candies may also dilute the bottle's distinctiveness does not necessarily mean that Alma–Leo's conduct here should not be enjoined. Alma–Leo's claim merely demonstrates that Coca–Cola has grounds to bring suits it has not as yet filed.

We finally note that the sale of Magic Powder will likely injure Coca–Cola's reputation. That finding may be separately determinative as "[a]n injunction must also be granted if the prior user shows a likelihood of injury to reputation." *Hyatt Corp.*, 736 F.2d at 1157 n. 2. Alma–Leo markets its bubble gum as Magic Powder. While the front label reads "Mad Scientist Magic Powder Bubble Gum," the seal across the container's top reads only "Magic Powder." The powder not only resembles cocaine but also has a texture remarkably similar to the drug. While we cannot dispute that the powder itself may not be solely the color white, that distinction is blurred by the containers in which the powder is sold. Slightly pink powder comes in a bright pink container, leaving the definite impression that the powder inside is white. The same applies to the yellow container. And respecting the latter, the powder inside does seem to be plain white. In sum, the association with Coca–Cola through the use of a bottle with the same shape will likely injure Coca–Cola's reputation, whether or not confusion takes place. *Cf. Coca–Cola Company v. Gemini Rising, Inc.*, 346 F.Supp. 1183, 1189 (E.D.N.Y.1972) ("To associate such a noxious substance as cocaine with plaintiff's wholesome beverage as symbolized by its 'Coca–Cola' trademark and format would clearly have a tendency to impugn that product and injure plaintiff's business reputation"). That association "is not a flight of fancy" as Coca–Cola's name is "derived from the Andean coca leaf plant and the African cola nut, extracts of which gave the beverage its flavor. The coca leaf is the source of cocaine." *Id.* at 1189 n. 7.[3] Our judgment is therefore informed not by the affidavits of the participants in the Davenport incident, but also by our own assessment.

That other powdered candy has been sold by a variety of companies does not exonerate Alma–Leo here either. Those products do not proclaim themselves to be "Magic Powder." Further, association with illicit drugs, especially rock-like cocaine

---

**3.** Reiterating the obvious, courts have noted the absence of cocaine in the beverage Coca–Cola. *See Coca–Cola Co. v. Koke Co.*, 254 U.S. 143, 145–46, 41 S.Ct. 113, 113–14, 65 L.Ed. 189 (1920); *see also Coca–Cola Company v. Gemini Rising, Inc.*, 346 F.Supp. at 1189 n. 7.

("crack"), may well present uniquely severe risks to reputation in today's environment.

Having ruled that the Illinois Anti–Dilution Act alone likely ensures success on the merits, we need not evaluate Coca–Cola's federal trademark allegations, nor its other claims. We are quite aware that Alma–Leo virtually neglects to discuss the Illinois Anti–Dilution Act in its response, but that omission cannot remove the state provision from consideration. Alma–Leo can and should address the Anti–Dilution Act at the preliminary injunction stage. For now, we evaluate that provision without aid from its counsel.

### III. *Other Requirements*

We quickly note that even though "consideration of the factors generally required to obtain a preliminary injunction may not be necessary under the Illinois Anti–Dilution Act," *Ringling Bros.–Barnum & Bailey Combined Shows, Inc., v. Celozzi–Ettelson Chevrolet, Inc.*, 855 F.2d 480, 485 (7th Cir.1988), prudence dictates that we do so. The Illinois statute defines the circumstances under which permanent injunctions should issue. Those limited criteria do not at all eliminate the need to make the various other demonstrations traditionally required for preliminary relief. *See, e.g., Kern*, 175 Ill.App.3d at 632, 529 N.E.2d at 1155, 125 Ill.Dec. at 79 (respecting claims arising out of the Illinois Anti–Dilution Act, "[i]n order to obtain [a preliminary] injunction, a party must show an ascertained right in need of protection, a likelihood of success on the merits, an inadequate remedy at law, and irreparable injury"); *see also American Snacks, Inc. v. Schaul*, 132 Ill.App.2d 718, 721, 270 N.E.2d 209, 211 (1st Dist.1971) (respecting same, "[p]laintiff however failed to support its petition with a showing that irreparable injury would result.... Moreover, the immediate harm caused the defendants by the issuance of a temporary injunction clearly outweighs whatever injury might result to plaintiff"). We therefore evaluate the relevant requirements one at a time.

### A. Irreparable Injury

Even absent our delving into the federal trademark/confusion issue, the dilution claim suffices respecting irreparable injury. "[I]t is the very nature of dilution to gnaw away insidiously at the value of a mark." *Hyatt Corp.*, 736 F.2d at 1158. That injury would be irreparable, not because money damages would fail to make the plaintiff whole, but rather because Coca–Cola cannot be expected to quantify the probable reduction in revenue. "[T]here is no effective way to measure the loss of sales or potential growth—to ascertain the people who don't knock on the door or to identify the specific persons who do not reorder because of the existence of the infringer." *Instrumentalist Co. v. Marine Corps League*, 509 F.Supp. 323, 333 (N.D.Ill.1981), *aff'd*, 694 F.2d 145 (7th Cir.1982). *See also Ringling Brothers–Barnum & Bailey*, 855 F.2d at 482 ("there is no effective way to measure the loss of audience or potential growth"). This difficulty in proving damages for the loss of corporate good will adequately demonstrates irreparable injury. *See, e.g., id.; see also Omega Importing Corp. v. Petri–Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir.1971).

Coca–Cola's delay in filing its motion does not render it potential harm any less irreparable. In fact, both sides allege that settlement efforts were attempted and only recently broke down. These events do not affect our consideration of the pending motion.

### B. The Balance of Harms

To reiterate, the marketing of Magic Powder risks significant injury in Coca–Cola's reputation and corporate good will. That potential harm cannot be outweighed by Alma–Leo's claims that the loss of its current inventory will be costly or that "mend[ing] its ways will be too expensive." *Processed Plastic Co. v. Warner Communications, Inc.*, 675 F.2d 852, 859 (7th Cir. 1982). Defendants in trademark dilution cases will always be able to marshall that claim. The point remains that Alma–Leo should have taken the risk of a TRO into account *ex ante*. It cannot now claim is-

suance would be too costly. Further, its repackaging expenses will merely be incurred in the short-term, as only the current inventory is at issue here. The vast majority of Alma–Leo's manufacturing, advertising and sales apparatus will remain the same, for compliance requires only that it choose a different container in which to market Magic Powder. *Contra Stokely–Van Camp Inc. v. Coca–Cola Co.*, 2 U.S.P. Q.2d 1225, 1226, 1987 WL 6300 (N.D.Ill. 1987) (defendant "would have to rename the product as well as change the name on all existing products, advertisements, promotionals and programs"). Finally, the sliding scale approach requires that we consider the strength of Coca–Cola's claim in balancing the equities. *See Hyatt Corp.*, 736 F.2d at 1159 ("we consider Hyatt Hotels' proof that Hyatt Legal Services is violating the Anti–Dilution Act to go substantially farther than showing a likelihood of success, and we may certainly take into account the strength of Hyatt Hotels' case in balancing the equities"). Accordingly, we have little difficulty in concluding that the balance of harms augur for issuance, and we make that call without debating whether issuance would preserve the vague notion of the "status quo."

### C. The Public Interest

We finally address the rather elusive public interest element. As a general matter, "[t]he public has an interest in the protection of trademarks," *Hyatt Corp.*, 736 F.2d at 1159, and dilution thereof cannot help but operate to the public's detriment. That conclusion renders unnecessary any inquiry into whether the dilution at bar trivializes the nation's anti-drug campaign and/or Coca–Cola's own efforts.

The public interest in having an additional competitor in the powdered candy market does not alter our conclusion. First, even assigning full weight to Alma–Leo's claim, we cannot conclude that a single additional competitor outweighs the admittedly more general interest in trademark protection. Second, our order does not at all preclude market participation of Alma–Leo's own Magic Powder in any other con-

tainer. Only the present inventory is at issue, and the public's interest in receiving solely that quantity cannot be terribly significant.

### CONCLUSION

For the foregoing reasons, plaintiff's motion for a temporary restraining order is granted for twenty days. The preliminary injunction hearing is set for August 30, 1989 at 10:00 a.m.