The **ROCK AND ROLL HALL OF FAME AND MUSEUM, INC.;** The **Rock and Roll Hall of Fame Foundation, Inc.,** Plaintiffs–Appellees,

v.

**GENTILE PRODUCTIONS; Charles M. Gentile,** Defendants–Appellants.

No. 96–3759.

United States Court of Appeals, Sixth Circuit.

Argued June 2, 1997.

Decided Jan. 20, 1998.

Rehearing and Suggestion for Rehearing En Banc Denied March 5, 1998.*

---

\* Chief Judge Martin would grant rehearing for the reasons stated in his dissent.

Regan J. Fay (argued and briefed), Paula B. Wilson, Jones, Day, Reavis & Pogue, Cleveland, OH, for Plaintiffs–Appellees.

Michael T. Cawley (briefed), Joseph W. Pappalardo (briefed), Gallagher, Sharp, Fulton & Norman, Cleveland, OH, J. Michael Murray (argued and briefed), Lorraine R. Baumgardner (briefed), Susan Marqulies (briefed), Berkman, Gordon, Murray & De-Van, Cleveland, OH, for Defendants–Appellants.

Stephen M. Trattner (briefed), Lewis & Trattner, Washington, DC, for Amicus Curiae Pebble Beach Co., Resorts of Pinehurst, Inc., Robert Trent Jones Golf Club, Inc.

Charles D. Ossola (briefed), Lowe, Price, Leblanc & Beckler, Alexandria, VA, for Amicus Curiae American Society of Media Photographers, Inc.

Before: MARTIN, Chief Judge; RYAN and BATCHELDER, Circuit Judges.

RYAN, J., delivered the opinion of the court, in which BATCHELDER, J., joined. MARTIN, C.J. (pp. 756–759), delivered a separate dissenting opinion.

RYAN, Circuit Judge.

## OPINION

The Rock and Roll Hall of Fame and Museum, Inc., and The Rock and Roll Hall of Fame Foundation, Inc., filed suit against Charles Gentile and Gentile Productions, alleging various trademark and unfair-competition claims under state and federal law. The plaintiffs moved for and were granted a preliminary injunction, on the authority of Fed. R.Civ.P. 65. The defendants appeal, claiming, essentially, that the district court mistakenly concluded that the plaintiffs have shown a strong likelihood of succeeding on the merits. We agree and therefore vacate the entry of the preliminary injunction.

### I.

In 1988, The Rock and Roll Hall of Fame Foundation registered the words, "THE ROCK AND ROLL HALL OF FAME," as its service mark, on the principal register at the United States Patent and Trademark Office. In 1991, the Foundation commissioned I.M. Pei, a world famous architect, to design a facility for The Rock and Roll Hall of Fame and Museum in Cleveland, Ohio. Pei's design was brought to life on the edge of Lake Erie, in the form of The Rock and Roll Hall of Fame and Museum which opened in September 1995.

In their briefs to this court, The Rock and Roll Hall of Fame and Museum and The Rock and Roll Hall of Fame Foundation have referred to themselves collectively as "the Museum." Throughout the remainder of this opinion, we will do the same.

The Museum states that its building design is "a unique and inherently distinctive symbol of the freedom, youthful energy, rebellion and movement of rock and roll music." Whatever its symbolism, there can be no doubt that the Museum's design is unique and distinctive. The front of the Museum is dominated by a large, reclining, triangular facade of steel and glass, while the rear of the building, which extends out over Lake Erie, is a striking combination of interconnected and unusually shaped, white buildings. On May 3, 1996, the State of Ohio approved the registration of the Museum's building design for trademark and service-mark purposes. The Museum has similar applications pending with the United States Patent and Trademark Office.

Charles Gentile is a professional photographer whose work is marketed and distributed through Gentile Productions. In the spring of 1996, Gentile began to sell, for $40 to $50, a poster featuring a photograph of the Museum against a colorful sunset. The photograph is framed by a black border. In gold lettering in the border underneath the photograph, the words, "ROCK N' ROLL HALL OF FAME," appear above the smaller, but elongated word, "CLEVELAND." Gentile's signature appears in small blue print beneath the picture of the building. Along the right-hand side of the photograph, in very fine print, is the following explanation: "©1996 Gentile Productions ... Photographed by: Charles M. Gentile[;] Design: Division Street Design[;] Paper: Mead Signature Gloss Cover 80# [;] Printing: Custom Graphics Inc.[;] Finishing: Northern Ohio Finishing, Inc."

In reaction to Gentile's poster, the Museum filed a five-count complaint against Gentile in the district court. The Museum's complaint contends that the Museum has used both its registered service mark, "THE ROCK AND ROLL HALL OF FAME," and its building design as trademarks, and that Gentile's poster infringes upon, dilutes, and unfairly competes with these marks. The Museum's somewhat unusual claims regarding its building design, then, are quite unlike a claim to a service-mark right in a building design that might be asserted to prevent the construction of a confusingly similar building.

Specifically, count one of the Museum's complaint alleges trademark infringement, in violation of 15 U.S.C. § 1114(1). Count two alleges unfair competition, false or misleading representations, and false designation of origin, in violation of 15 U.S.C. § 1125(a). Count three alleges dilution of trademarks, in violation of 15 U.S.C. § 1125(c) and Ohio common law. Counts four and five allege unfair competition and trademark infringement under Ohio law.

The Museum sought a preliminary injunction and the district court held a hearing on the motion. It is clear from a review of the Museum's motion and the hearing transcript that, whatever the scope of the Museum's complaint, the Museum's request for a preliminary injunction was based on the theory: (1) that the Museum has used both its building design and its service mark, "THE ROCK AND ROLL HALL OF FAME," *as trademarks;* and (2) that both the photograph of the Museum and the words identifying the Museum in Gentile's poster are uses of the Museum's trademarks that should be enjoined because they are likely to lead consumers to believe that Gentile's poster is produced or sponsored by the Museum.

Thus, in its motion, the Museum argued that, because Gentile is "using the Museum's trademarks on posters in a manner which reflects a deliberate attempt to confuse, mislead and deceive the public into believing that the posters are affiliated with the Museum, ... [t]he Museum has an extremely strong probability of success on the merits of its claims for trademark infringement and unfair competition." Similarly, at the hearing, the Museum stated only that its motion was "about trademark infringement, [section] 43(a), violations of the Lanham Act in passing off," although its complaint was broader. Accordingly, the district court explained to Gentile that he needed to respond only to the Museum's arguments in support of its motion, not its entire complaint.

The Museum submitted several exhibits in support of its motion. Of particular concern in the present dispute is a poster the Museum sells for $20. Although the Museum's poster, like Gentile's, features a photograph of the Museum at sunset, the photographs of

the building in the two posters are very different. Gentile's photograph is a ground-level, close-up view of the Museum taken at a time when the building appears to be closed. It is an artistically appealing photograph of the Museum and virtually nothing else. In contrast, the Museum's poster features a photograph of the Museum, taken from an elevated and considerably more distant vantage point, on the Museum's opening night, when red carpet stretched from the Museum's front doors, and interior lights highlighted its dramatic glass facade. There is a great deal of detail in the foreground of the Museum's photograph including the full esplanade in front of the building, and even a portion of the highway adjacent to the property. It, too, is an artistically pleasing photograph of the Museum and its surrounding environment, but it is a very different picture than Gentile's.

The Museum's poster is framed by a white border, in which the words, "The Rock and Roll Hall of Fame and Museum—Cleveland," appear beneath the photograph. To the left of these words is a small circular designation, which appears to be a trademark (the "composite mark"). In the center of this composite mark is a triangle formed by six lines fanning out from a single point. The triangle is intersected by three horizontal lines, contains two dots running vertically, and may be intended to be evocative of the Museum's building design. In a circle around this triangular design are the words, "**ROCK AND ROLL** HALL OF FAME & MUSEUM."

In addition to the parties' posters, the record on appeal contains color copies of photographs of several items produced by the Museum; specifically, an advertisement for the Museum's opening, a paper weight, several postcards, and two T-shirts. One postcard features the same photograph which appears in the Museum's poster, one features a photograph of the rear of the Museum, and the third features six different close-up photographs of various parts of the Museum. One of the T-shirts bears a detailed drawing of the front of the Museum, a small drawing of the back of the Museum, the composite mark, and the words, "The house that rock built." The other T-shirt features a similar drawing of the front of the Museum, set in front of several other buildings, and the words "Cleveland: Home of the Rock and Roll Hall of Fame + Museum." The paperweight is a "snow dome" that contains a three-dimensional rendition of the Museum, and bears the words, "Rock and Roll Hall of Fame," on its base. The advertisement for the opening night concert features a man reaching skyward with one of the Museum's paperweights. The composite mark appears on the bottom of the advertisement, and the triangular design from that mark appears on the left breast of the man holding the paperweight.

The Museum also submitted affidavits in support of its motion. In particular, Robert Bosak, the controller of the Museum, averred that "the Museum has used versions of the building shape trademark on T-shirts and a wide variety of products, including posters, since as early as June, 1993." According to his review of sales reports from the Museum's store, merchandise "featur[ing] the building shape have been among [the Museum's store's] top selling items." Rachel Schmelzer, an employee in the Museum's licensing and sponsorship department, averred that she informed Gentile, on more than one occasion before Gentile began selling his poster, that the Museum considered Gentile's poster to be an infringing trademark use of the Museum's building design.

On May 30, 1996, the district court concluded that the Museum had "shown a likelihood of success in proving its federal and state claims," and it granted the Museum's motion for a preliminary injunction. *Rock and Roll Hall of Fame and Museum, Inc. v. Gentile Prods.*, 934 F.Supp. 868, 872–73 (N.D.Ohio 1996). The district court explained, *inter alia*, that

> [a]s a result of the extensive advertising and promotional activities involving the [Museum's] "ROCK AND ROLL HALL OF FAME" and building design trademarks, the public has come to recognize these trademarks as being connected with or sold by the Museum, its official licensees and/or official sponsors.

*Id.* at 871. The district court found that the Museum's building design was a fanciful

mark, and that Gentile's use of the Museum's building design and the words, "ROCK N' ROLL HALL OF FAME," was likely to cause confusion. *Id.* at 871–72. It then determined that the balance of equities favored granting the injunction, and it ordered Gentile to refrain from further infringements of the Museum's trademarks and to "deliver ... for destruction all copies of defendants' poster in their possession." *Id.* at 872–73.

## II.

We review a district court's decision to grant a preliminary injunction for abuse of discretion. *See Sandison v. Michigan High Sch. Athletic Ass'n,* 64 F.3d 1026, 1030 (6th Cir.1995). When considering a motion for a preliminary injunction, the district court should consider four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. *Id.* "The district court's determination will be disturbed only if the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard." *Blue Cross & Blue Shield Mut. of Ohio v. Blue Cross and Blue Shield Ass'n,* 110 F.3d 318, 322 (6th Cir.1997).

Gentile argues that the district court abused its discretion when it concluded that the Museum had shown a likelihood of success on the merits for purposes of the preliminary injunction. Specifically, Gentile argues that his photograph of the Museum is not a trademark use of the Museum's building design. Gentile also argues that his use of the words, "ROCK N' ROLL HALL OF FAME," is a non-trademark use which simply and accurately describes his non-infringing photograph of the Museum. Because we agree that the record before us does not establish a strong likelihood that Gentile has made an infringing trademark use of the Museum's name or building design, we will vacate the preliminary injunction.

A trademark is a *designation,* "any word, name, symbol, or device, or any combination thereof," which serves "to identify and distinguish [the] goods [of the mark's owner] ... from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127. Although some marks are classified as inherently distinctive and therefore capable of protection, *see generally Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768–69, 112 S.Ct. 2753, 2757–58, 120 L.Ed.2d 615 (1992), it is not the case that all inherently distinctive symbols or words on a product function as trademarks. *See, e.g., Self–Realization Fellowship Church v. Ananda Church of Self–Realization,* 59 F.3d 902, 906–07 (9th Cir.1995); *Clairol Inc. v. Gillette Co.,* 389 F.2d 264, 269–71 & n. 16 (2d Cir. 1968); *see generally* 1 J. McCarthy, McCarthy on Trademarks and Unfair Competition § 3:3 (4th ed.1997). Rather, in order to be protected as a valid trademark, a designation must create "a separate and distinct commercial impression, which ... performs the trademark function of identifying the source of the merchandise to the customers." *In re Chemical Dynamics, Inc.,* 839 F.2d 1569, 1571 (Fed.Cir.1988); *see also* 1 J. McCarthy § 3:3.

It is well established that "[t]here is no such thing as property in a trademark except as a right appurtenant to an established business or trade in connection with which the mark is employed." *United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 97, 39 S.Ct. 48, 50–51, 63 L.Ed. 141 (1918). Thus, whether alleging infringement of a registered trademark, pursuant to 15 U.S.C. § 1114(1), or infringement of an unregistered trademark, pursuant to 15 U.S.C. § 1125(a)(1), it is clear that a plaintiff must show that it has actually used the designation at issue *as a trademark,* and that the defendant has also used the same or a similar designation *as a trademark. See, e.g., Holiday Inns, Inc. v. 800 Reservation, Inc.,* 86 F.3d 619, 622–23 (6th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 770, 136 L.Ed.2d 715 (1997); *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.,* 931 F.2d 1100, 1105 (6th Cir.1991). In other words, the plaintiff must establish a likeli-

hood that the defendant's designation will be confused with the plaintiff's trademark, such that consumers are mistakenly led to believe that the defendant's goods are produced or sponsored by the plaintiff. *See, e.g., Holiday Inns*, 86 F.3d at 623. Although the parties have not discussed the Museum's state-law claims, we note that trademark claims under Ohio law follow the same analysis. *See Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 288 (6th Cir.1997).

At the hearing on the Museum's motion, Gentile showed the district court a poster of an illustration of the Cleveland skyline, produced by another artist, that included the Museum as one building among many. Gentile also referred to a quilt or blanket which apparently depicts "all kinds of landmarks of Cleveland," again including the Museum among several others. In response to these exhibits, the Museum stated that "they illustrate something [that the Museum does not] think . . . [is] a problem because they show a whole collage of downtown buildings and scenes around Cleveland. That's not what [the Museum is] trying to stop." However, the Museum argued that Gentile's poster features nothing but the Museum and a sunset. According to the Museum, Gentile's production of his poster was like "going into a store, getting a bottle of [C]oke, taking a picture, [of it and] putting . . . [C]oke underneath."

Although we are mindful that we are called upon to settle only the present dispute, we have found the foregoing exchange from the hearing on the Museum's motion a helpful guidepost for our discussion.

On the one hand, although Gentile's exhibits, which depict the Museum as one landmark among others or as one of several buildings in the Cleveland lakefront skyline, present easier cases, their significance is consonant with our initial impression of Gentile's poster. That is to say that, when we view the photograph in Gentile's poster, we do not readily recognize the design of the Museum's building as an indicator of source or sponsorship. What we see, rather, is a photograph of an accessible, well-known, public landmark. Stated somewhat differently, in Gentile's poster, the Museum's building strikes

us not as a separate and distinct mark *on the good*, but, rather, as the good itself.

On the other hand, the import of the Museum's Coke bottle example is not lost upon us. Indeed, the Museum's example is not entirely concocted, *see Coca–Cola Co. v. Gemini Rising, Inc.*, 346 F.Supp. 1183 (E.D.N.Y.1972), and we accept that a photograph which prominently depicts another person's trademark might very well, wittingly or unwittingly, use its object as a trademark. However, after reviewing the record before us with this possibility in mind, we are not persuaded that the Museum uses its building design as a trademark. Thus, we are not dissuaded from our initial impression that the photograph in Gentile's poster does not function as a trademark.

The district court found that the Museum's building design is fanciful, that the Museum has used its building design as a trademark, and that "the public has come to recognize [the Museum's building design] trademark[ ] as being connected with or sold by the Museum." *Rock and Roll Hall of Fame*, 934 F.Supp. at 871. There are several problems with these critical findings. First, we find absolutely no evidence in the record which documents or demonstrates public recognition of the Museum's building design as a trademark. Such evidence might be pivotal in this case, but it is lacking. Indeed, we are at a loss to understand the district court's basis for this significant finding of fact.

Second, although no one could doubt that the Museum's building design is fanciful, it is less clear that a picture or a drawing of the Museum is fanciful in a trademark sense. Fanciful marks are usually understood as "totally new and unique combination[s] of letters or symbols" that are "invented or selected for the sole purpose of functioning as a trademark." 1 J. McCarthy § 11:5. Although the plaintiffs "invented" the Museum, the Museum's existence as a landmark in downtown Cleveland undermines its "fancifulness" *as a trademark*. A picture or a drawing of the Museum is not fanciful in the same way that a word like Exxon is when it is coined as a service mark. Such a word is distinctive as a mark because it readily appears to a consumer to have no other pur-

pose. In contrast, a picture of the Museum on a product might be more readily perceived as ornamentation than as an identifier of source.

We recognize, of course, that a designation may serve both ornamental and source-identifying purposes, *see, e.g., WSM, Inc. v. Tennessee Sales Co.,* 709 F.2d 1084, 1087 (6th Cir.1983), and this brings us to our principal difficulty with the Museum's argument and the district court's judgment. As we described *supra,* although the Museum has used drawings or pictures of its building design on various goods, it has not done so with any consistency. As Bosak stated in his affidavit, "the Museum has used *versions* of the building shape trademark on ... a wide variety of products." (Emphasis added.) Several items marketed by the Museum display only the rear of the Museum's building, which looks dramatically different from the front. Drawings of the front of the Museum on the two T-shirts in the record are similar, but they are quite different from the photograph featured in the Museum's poster. And, although the photograph from the poster is also used on a postcard, another postcard displays various close-up photographs of the Museum which, individually and perhaps even collectively, are not even immediately recognizable as photographs of the Museum.

In this regard, this case is similar to those in which a party has claimed trademark rights in a famous person's likeness. *See, e.g., Pirone v. MacMillan, Inc.,* 894 F.2d 579, 583 (2d Cir.1990); *Estate of Presley v. Russen,* 513 F.Supp. 1339, 1363–64 (D.N.J.1981). In *Estate of Presley,* the court concluded that, although one particular image of Presley had been used consistently as a mark, "the available evidence [did] not support [the estate's] broad position" that all images of Presley served such a function. *Estate of Presley,* 513 F.Supp. at 1364. Similarly, in *Pirone,* the court stated that "[e]ven if [the plaintiff] could show that it has established a trademark in a particular pictorial representation of [Babe] Ruth, such a trademark would not cover all photos taken of Ruth during his career, no matter how dissimilar." *Pirone,* 894 F.2d at 583. The court explained that, given that "Ruth was one of the most photographed men of his generation, ... [i]t cannot be said that every photograph of Ruth serves [the] origin-indicating function" of a trademark. *Id.*

In reviewing the Museum's disparate uses of several different perspectives of its building design, we cannot conclude that they create a consistent and distinct commercial impression as an indicator of a single source of origin or sponsorship. To be more specific, we cannot conclude on this record that it is likely that the Museum has established a valid trademark in every photograph which, like Gentile's, prominently displays the front of the Museum's building, "no matter how dissimilar." Even if we accept that consumers recognize the various drawings and pictures of the Museum's building design as being drawings and pictures of the Museum, the Museum's argument would still fall short. Such recognition is not the equivalent of the recognition that these *various* drawings or photographs indicate a *single* source of the goods on which they appear. Consistent and repetitive use of a designation as an indicator of source is the hallmark of a trademark. Although the record before us supports the conclusion that the Museum has used its composite mark in this manner, it will not support the conclusion that the Museum has made such use of its building design.

In the end, then, we believe that the district court abused its discretion by treating the "Museum's building design" as a single entity, and by concomitantly failing to consider whether and to what extent the Museum's use of its building design served the source-identifying function that is the essence of a trademark. As we have noted, we find no support for the factual finding that the public recognizes the Museum's building design, in any form, let alone in all forms, as a trademark. In light of the Museum's irregular use of its building design, then, we believe that it is quite unlikely, on the record before us, that the Museum will prevail on its claims that Gentile's photograph of the Museum is an infringing trademark use of the Museum's building design.

Our discussion of the district court's treatment of the Museum's building design would, of course, be much ado about nothing were

we persuaded that Gentile's use of the words, "ROCK N' ROLL HALL OF FAME—CLEVELAND," was sufficient to sustain the injunction. We are not, however, persuaded. In the first place, the district court did not give separate treatment to Gentile's use of the Museum's building design—the photograph of the building itself—and to Gentile's use of words approximating the Museum's registered service mark. Thus, we cannot be certain how the district court would have viewed the use of the words in the event that the photograph was found to be non-infringing. For purposes of our review, then, we are not free to sustain the preliminary injunction on the theory that it would have been no abuse of discretion had the district court concluded that Gentile's use of the words, "ROCK N' ROLL HALL OF FAME," was alone likely to constitute a trademark violation. The district court made no such finding.

Moreover, we think Gentile's use of these words may very well constitute a fair use of the Museum's registered service mark, pursuant to 15 U.S.C. § 1115(b)(4). Section 1115(b)(4) permits a party to defend an infringement charge on the ground

> [t]hat the use of the ... term, or device charged to be an infringement is a use, otherwise than as a mark ... of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party.

Although there can be no doubt that Gentile's use of the Museum's service mark presents an unusual case, his use of the words, "ROCK N' ROLL HALL OF FAME," would be nothing more than a description of his own "good," in the event that the Museum fails to prove that Gentile's photograph makes an infringing use of the Museum's building design. *See, e.g., WCVB–TV v. Boston Athletic Ass'n,* 926 F.2d 42, 46 (1st Cir. 1991); *Pirone,* 894 F.2d at 584. The critical question, then, will be whether Gentile's use of the Museum's service mark was made fairly and in good faith, and whether his use was "otherwise than as a [trade]mark." With regard to this latter inquiry, the answer will essentially turn on whether consumers view the words, "ROCK N' ROLL HALL OF FAME," as a label for Gentile's photograph, or as an indicator that Gentile's photograph originated with or was sponsored by the Museum. As always, the touchstone will be the likelihood of consumer confusion.

To summarize, then, we find that the district court did not properly consider the validity of the Museum's claim to trademark rights in its building design. In light of this error, we cannot be certain that the district court properly assessed Gentile's fair use defense in relation to his use of the Museum's service mark. Thus, we are compelled to conclude that the district court abused its discretion when it concluded that the Museum had shown a strong likelihood of proving its trademark infringement claims. Indeed, on the record before us, we are left with grave doubts as to the likelihood of the Museum's success on these claims.

## III.

For all of the foregoing reasons, we **VACATE** the judgment of the district court, and **REMAND** for further consideration.

BOYCE F. MARTIN, Jr., Chief Judge, dissenting.

I cannot imagine a more cogent explanation of the meaning of a trademark than that offered by Justice Holmes in *Beech–Nut Co. v. Lorillard Co.,* 273 U.S. 629, 633, 47 S.Ct. 481, 482, 71 L.Ed. 810 (1927).

> A trademark is not only a symbol of an existing good will, although it is commonly thought of only as that. Primarily it is a distinguishable token devised or picked out with the intent to appropriate it to a particular class of goods and with the hope that it will come to symbolize good will.

*Id.* Because I believe that the Museum has devised a distinguishable token, appropriated that token to a particular class of goods and plainly demonstrated quantifiable good will, I respectfully dissent.

The majority could have scarcely chosen a better analogy to adopt than that of the Coca–Cola bottle. Doubtless no symbol in the world is so readily recognized. This famous form serves two purposes: it allows the consumer to identify immediately what's

inside the bottle; it also serves a utilitarian function by containing the Coca–Cola Company's primary product—Coca-Cola. Just as with a Coca–Cola bottle, more than one mark can serve to identify a single item. For example, the words "Coca–Cola", the signature script and the distinctive bottle shape are all trademarked. *See, e.g., Coca–Cola Co. v. Alma–Leo U.S.A., Inc.,* 719 F.Supp. 725, 726 (N.D.Ill.1989) (noting trademark of bottle shape); *Coca–Cola Co. v. Gemini Rising, Inc.,* 346 F.Supp. 1183, 1186–87 (E.D.N.Y.1972) (noting trademarks in product name and stylized script). All can be found on one product.

The Coke bottle analogy is significant for another reason. The trademarked shape of the bottle has three dimensions. Regardless of the angle from which it is viewed, it is still recognizable as a Coke bottle. When a Coke bottle is photographed it loses a dimension, but the subject of the picture remains recognizable as one of a trademarked, three dimensional figure. If a photograph of a trademark—for example, one of a Coke bottle—can be sold by the owner of the trademark in a poster form, that poster naturally must be recognized as one of the owner's "goods", albeit a derivative good.

In this case, the physical structure of the Museum, the I.M. Pei-designed building, is "the Coke bottle." *Webster's* defines *token* as "an outward sign or expression; symbol, emblem." Webster's New Collegiate Dictionary 1227 (1977). The Museum claims, as I am persuaded, that its building symbolizes something unique and protectable under the trademark laws of the United States. What that something is will arouse different feelings in whomever views the Museum, whether in person or through artists' renderings or photographs. Beyond embodying "the freedom, youthful energy, rebellion and movement of rock and roll music," the Museum building serves a utilitarian function. Like the Coke bottle, the building is also a container. Instead of containing a soft drink, the Museum envelops an array of tangible and intangible elements. It embraces nostalgia; it shelters memorabilia from one of this century's cardinal art forms; it also harbors a bazaar selling snow domes and postcards,

T-shirts, baseball caps, and posters—souvenirs for the pilgrims of popular culture. It is this amalgam, of which posters are but a part, that is "the good itself." In short, it is the Coca–Cola in the bottle.

Nobody disputes that the Museum is "unique and distinctive." I.M. Pei may well be the only living architect whose name would be recognized by more than a handful of Americans. Were the Rock and Roll Foundation to have sought only an attic in which to store its artifacts, it might have leased a warehouse with substantially more space at a fraction of the cost.

Moreover, an effort by the Museum to register a warehouse as a mark would have failed. As we have previously said, a purely functional design is incapable of serving as a trademark. *WSM, Inc. v. Tennessee Sales Co.,* 709 F.2d 1084, 1087 (6th Cir.1983). The Museum enabled its building to serve as its mark by constructing a signature edifice so unique as to offer instant recognizability. This is no underground operation; as a tourist destination, and a non-profit one at that, perpetual promotion is the Museum's lifeline. Through the marketing of the tchotchkes described above, the Museum not only garners revenue, it also helps to expand the renown of the Rock and Roll Hall of Fame. As much as admission receipts, merchandise sales—some $15 to 20 million annually for the Museum—quantify the "good will" of which Justice Holmes wrote.

This controversy is before us because two parties are selling what is substantially an identical product. *See Scarves by Vera, Inc. v. Todo Imports Ltd.,* 544 F.2d 1167, 1174 (2d Cir.1976). "The only competition between the parties, fair or unfair, can be that where some common market exists for their respective products. The products need not be identical; it is enough that they are so closely related as to confuse consumers in the marketplace." *Id.* The majority concludes that Gentile's use of the caption "ROCK AND ROLL HALL OF FAME" accompanying the photograph of the Museum "would be nothing more than a description of his own 'good,'" and that, "in Gentile's poster, the Museum's building strikes us not as a separate and distinct mark *on the good,* but,

rather, as the good itself." Such a conclusion exposes what I see as the flaw in the majority's premise. Gentile's poster is not a photograph of "the *good,*" but rather, a photograph of "the *mark.*" Applying the majority's reasoning to the issue before us, the Museum sells buildings; Gentile sells photographs of buildings. I am certain that regardless of who produces it, the good is the poster.

The majority is unable to "conclude ... that the Museum has established a valid trademark in every photograph which, like Gentile's, prominently displays the front of the Museum's building, 'no matter how dissimilar.'" But who disputes this? Not the Museum. It is not Gentile's *photograph* of the building that infringes on the Museum's mark; it is his *use* of that photograph—and more precisely, his use of the protected mark that unfairly competes with the Museum. The Museum does not imply that a poster of the Cleveland skyline, of which the building is now a part, would infringe upon the Museum's mark. Certainly any visitor to the City of Cleveland could walk up and take a picture of the Museum. Any artist could sketch the building freely. Indeed, the Museum would be powerless to protest. These depictions are not "uses in commerce" until they are offered for sale. We reaffirmed in *Esercizio v. Roberts,* 944 F.2d 1235, 1243 (6th Cir. 1991), that "[w]here the copying by one party of another's product is not done to deceive purchasers and thus derive a benefit from another's name and reputation, but rather to avail oneself of a design which is attractive and desirable, a case of unfair competition is not made out."

Furthermore, not only may Gentile take a photograph of the building, he can *sell* a photograph of it—the Lanham Act only prevents him only from "using in commerce" his photograph of the trademark in such a way as to cause a "likelihood of confusion" in the market place. It is not our place to try to list, even if we could, every commercial possibility for the work of a professional photographer of obvious talent. Merely selling a poster of its own trademark does not give the Museum the right to enjoin every duplication of its mark, only those that compete directly

with its own product in similar channels of commerce. *See, e.g., Boston Athletic Ass'n v. Sullivan,* 867 F.2d 22, 35 (1st Cir.1989)(acknowledging that trademarks create no "right in gross" yet confusing uses are enjoinable); *Boston Professional Hockey v. Dallas Cap & Emblem Mfg., Inc.,* 510 F.2d 1004 (5th Cir.1975) (holding duplication and sale of trademarked hockey team emblems as "products" violated Lanham Act).

Although the majority rejects the idea that the Museum "uses its building design as a trademark," the plain meaning of the wording of the Lanham Act suggests otherwise. As the majority notes, the law provides no trademark protection absent that mark's use in commerce. The statute provides:

> [t]he term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be in use in commerce—
>
> (1) on goods when—
>
> (A) it is placed *in any manner on the goods* or their containers or the displays associated therewith or on the tags or labels affixed thereto ... and
>
> (B) the goods are sold or transported in commerce
>
> ....

15 U.S.C. § 1127 (1994)(emphasis added). The same section of the Act provides that

> [t]he term "trademark" includes any word, name, symbol, or device, or any combination thereof—
>
> (1) used by a person, or
>
> (2) which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter,
>
> to identify and distinguish his or her goods, including a unique product from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.

15 U.S.C. § 1127 (1994).

The majority's doubts that the Museum "use[d] its building as a trademark" can be answered by sequence of events in this case.

The architect and building design were approved years before the Museum's building came into being. According to the Museum, "versions of the building shape [were used] on T-shirts and a wide variety of products, including posters, since as early as June, 1993." Such use predates the opening of the Museum by more than two years; the Museum would have then been not a public landmark, but a construction project. As properly noted by the majority, there can be no trademark without a dependent product. If the Museum was using its trademarks before the building was completed, what were its "goods"? The goods were the promotional material it published and sold, which announced to the public the coming of a place where not only could they measure their own lives by the evolution of rock music, they could also buy *more* promotional material to show for their visits. Whether viewed as a "service" or an intangible "good" any museum provides a place where the public can come to appreciate the theme promoted by the museum's sponsors. As we have seen, however, provision of such an intangible need not be the museum's exclusive good.

The majority is also troubled by the various "versions" of the Museum's likeness. Yet, if as the majority concedes, the Museum building is unique and distinctive, should it matter from what angle the building is depicted? The building itself is fixed in location; any change in perspective depends on the viewer. Again, here the Coke bottle example is helpful. If Coca–Cola came in a ten-story high bottle, would the trademark enjoy any less protection? A photograph of that bottle would still be of a photograph *of a trademark*. The Coca–Cola Company could not only sell posters of its giant bottle, it could enjoin others from doing so. If a particular photograph of the bottle were not recognizable, that would not impair the protection of *the bottle itself* as a mark. If a photograph was not recognizable as one of a trademark, there would be no likelihood of confusion and thus no controversy to litigate.

The record includes official certificates for five trademarks and two service marks registered with the State of Ohio. All seven certificates describe the registered mark as being the "Rock and Roll Hall of Fame and Museum Building" or the "Rock and Roll Hall of Fame and Museum Building Shape." Some version of the Museum's shape appears in each of the exhibits of the T-shirts, snow dome, and posters supplied in the record. That the impressions of the building differ from product to product is not inconsistent with the mark's registration.

The majority's observation that "[a] picture or a drawing of the Museum is not fanciful in the same way that a word like Exxon is when it is coined as a service mark," could not be more accurate or less relevant. Moreover, I think such a deduction ignores the sound reasoning of the Supreme Court's holding in *Qualitex Co. v. Jacobson Products Co., Inc.,* 514 U.S. 159, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995). In *Qualitex,* the plaintiff's distinctive green-gold color was held to be a valid trademark, even though it had a functional use beyond that of identifying the product. "Since human beings might use as a 'symbol' or 'device' almost anything at all that is capable of carrying meaning, [the language of 15 U.S.C. § 1127] read literally, is not restrictive." *Qualitex,* 514 U.S. 159, 162, 115 S.Ct. 1300, 1302–03 (1995).

There is no meaningful legal distinction between a three-dimensional and a two-dimensional trademark. I believe the Museum has a valid trademark in its building, and that a photographic image of the museum building could qualify as a trademark on merchandise. I do not read the Lanham Act to mean that simply because a trademark is also the subject of a poster it should enjoy any less protection.

I therefore respectfully dissent.