D & J MASTER CLEAN,
INC., Plaintiff,

v.

The SERVICEMASTER COMPANY,
Defendant.

No. C2–01–524.

United States District Court,
S.D. Ohio,
Eastern Division.

Jan. 22, 2002.

Lance Christopher Venable, James E. Rook, Ellis Venable & Busam, Phoenix, AZ, Eric Jay Wittenberg, Columbus, OH, for Plaintiff.

Michael R. Gray, Gray, Plant, Mooty, Mooty & Bennett, PA, Minneapolis, MN, Michael Karl Yarbrough, Frost Brown Todd LLC, Columbus, OH, for Defendant.

### *ORDER AND OPINION*

MARBLEY, District Judge.

### I. INTRODUCTION

This matter is before the Court on Plaintiff's Amended Motion for Preliminary and Permanent Injunction filed on June 22, 2001, and Defendant's Motion for Judgment on Partial Findings Pursuant to Rule 52(c) of the Federal Rules of Civil Procedure filed on October 29, 2001. On October 1 and 2, 2001, this Court held a preliminary injunction hearing. For the following reasons, upon consideration of the evidence adduced at the hearing and the arguments of counsel, the Court **DE-NIES** Plaintiff's motion and **DENIES** Defendant's motion.

### II. STATEMENT OF FACTS

Plaintiff D & J Master Clean ("Master Clean") is an Ohio Corporation that maintains its principal place of business in Franklin County, Ohio. Master Clean provides, among other services, carpet cleaning and commercial janitorial services throughout the Central Ohio area. Plaintiff has used the service mark "MASTER *CLEAN*" since its inception in 1989. Plaintiff has not registered MASTER *CLEAN* as a trademark, but has acted to protect its common law trademark rights in this service mark, and has invested approximately $500,000 per year in developing a brand name and customer loyalty to it.

Defendant ServiceMaster Company ("SMC") is a Delaware Corporation that is licensed to conduct business in Ohio, and has provided cleaning services since its founding in 1929. Today, SMC and its various affiliates and franchisees also offer hospital and pharmacy management services, food management services, lawn care and maintenance services, home inspection services, and pest control services. The mark *"ServiceMASTER®"* has been used by SMC and its predecessors in connection with commercial and residential cleaning services since at least 1954.

In or about January 1997, SMC expanded its *ServiceMASTER* family of marks to include the marks *"ServiceMASTER Clean®"* and *"ServiceMASTER Clean*

AND DESIGN."[1] Defendant adopted these new marks to distinguish better SMC's professional cleaning services and franchise systems from its other expanding service groups, such as its home health care, lawn care, and food management groups. From 1997 to 1999, Defendant and its franchisees changed their use and display of marketing materials, business forms and other printed materials, uniforms, internet web sites, training manuals, decals, interior and exterior signs, telephone directory listings, and the like, from *ServiceMASTER* to *ServiceMASTER Clean* and *ServiceMASTER Clean* AND DESIGN. SMC estimates that the company and its franchisees spent over $1 million in transition costs doing so. Defendant also estimates that an average of $14 million has been spent each year on regional and local advertising and promotion of the *ServiceMASTER Clean* mark in addition to the $2.5 million expended annually at the national level.

Columbus-area residents have been served by *ServiceMASTER* or *ServiceMASTER Clean* franchisees since the 1960s, when the first *ServiceMASTER* franchise was established there. There are currently more than 130 SMC franchisees operating in Ohio, including eleven in the seven-county Central Ohio area. With more than 2700 franchisees in the United States, SMC's *ServiceMASTER Clean* franchise system is one of the nation's largest residential and commercial cleaning businesses.

Plaintiff and Defendant are direct competitors in Central Ohio. Plaintiff claims that Defendant, by adopting its *ServiceMASTER Clean* mark, has created confusion among consumers about the two companies. Master Clean sent a cease and desist letter to SMC on or about October 16, 2000, asking that SMC cease using the *ServiceMASTER Clean* mark in the Central Ohio market. Defendant has ignored the letter and continued to use this mark in Central Ohio. As a result, Plaintiff alleges that it has lost business, has had the value of its service mark diluted, and has lost reputation and good will in the community. Plaintiff filed suit in this Court and seeks a preliminary and permanent injunction enjoining Defendant from further use of the *ServiceMASTER Clean* slogan and service mark in the Central Ohio market.

### III. MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION

In determining whether to issue a preliminary injunction, the district court must look at: (1) whether the movant has shown a strong likelihood of success on the merits; (2) the irreparable harm that could result to the movant if the injunction is not issued; (3) the possibility of substantial harm to others if the injunction is issued; and (4) whether the public interest would be served by issuing the injunction. *Rock and Roll Hall of Fame and Museum, Inc. v. Gentile Productions*, 134 F.3d 749, 753 (6th Cir.1998). The elements are factors to be balanced against each other, but each element need not be satisfied to issue a preliminary injunction. *Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1480 (6th Cir.1995) (citing *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir.1985)). A preliminary injunction is an extraordinary remedy that should only be granted if the movant carries his or her burden of proving that the circumstances clearly demand it. *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (citations omitted). The Court will examine each of these elements to deter-

---

**1.** Defendant possesses the rights to 27 federal-   ly-registered marks.

mine whether the Plaintiff has met its burden.

## A. Likelihood of the Success on the Merits

█ Plaintiff claims that Defendant's actions constitute an intentional infringement of the trademarks and service marks of Master Clean, and unfair competition in violation of the Lanham Act. 15 U.S.C. § 1125(a). To prove these allegations, Master Clean must demonstrate that it has an interest in a senior trademark that may be protected, and that SMC's use of the term *"ServiceMASTER Clean"* is likely to cause confusion or mistake, or is likely to deceive a reasonable consumer as to the origin, sponsorship, or approval of Master Clean's goods or services. *Id.* Plaintiff is unlikely to satisfy this test for two reasons. First, Plaintiff's claims are precluded by the "tacking rule." Second, even if the tacking rule does not apply, Plaintiff cannot establish a likelihood of confusion between its mark and that of Defendant.

### 1. Tacking Rule

Plaintiff's claims are precluded by the "tacking rule."[2] The Sixth Circuit has stated that tacking is appropriate where the modified mark is "the legal equivalent of the [earlier mark] or indistinguishable therefrom.... A determination of legal equivalence may be based on the visual or aural appearance of the marks themselves." *Data Concepts, Inc. v. Digital Consulting, Inc.*, 150 F.3d 620, 623 (6th Cir.1998) (citation omitted). As the Ninth Circuit has observed: "Without tacking, a trademark owner's priority in his mark would be reduced each time he made the slightest alteration to the mark, which would discourage him from altering the mark in response to changing consumer preferences, evolving aesthetic developments, or new advertising and marketing styles." *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1048 (9th Cir.1999).

█ In this case, SMC's appendage of the generic term *"Clean"* to its long-established primary mark, *ServiceMASTER*, is covered by the tacking rule. Defendant's *ServiceMASTER* mark has been used throughout the United States since 1954, and in Central Ohio since the 1960s. SMC's decision to modify slightly its mark was reasonable and lawful. The word *"Clean"* is purely descriptive and adds nothing of significance to the original mark. SMC's Vice President for Marketing and Communications, James Wassell, testified that the word *"Clean"* was a "descriptor ... an appended element to our name" used to identify the services offered by *ServiceMASTER* franchises. This minor alteration does not change the basic commercial impression that Central Ohio consumers have had of the *ServiceMASTER* mark for many years. As local franchisee Pat Marshall stated, the alteration "emphasizes *ServiceMASTER*. It is a core value corporation. It's just as a branch of *ServiceMASTER*, we happen to clean. So I would never say that we take the emphasis off of *ServiceMASTER*." Given that Defendant's *ServiceMASTER* mark was long-established, federally registered, and widely recognized when Plaintiff chose to use its MASTER *CLEAN* mark, Plaintiff's claims of trademark infringement are precluded.

---

**2.** Professor Thomas McCarthy has described the "tacking" rule as follows: "Minor changes in a mark which do not change the basic, overall commercial impression created on buyers will not constitute any abandonment and will not interrupt the user's chain of ownership back to adoption and use of the original form." *See* Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 17:27 (4th ed.1998).

■ To the extent that there is a conflict between Plaintiff's MASTER *CLEAN* mark and Defendant's *ServiceMASTER Clean* mark, the latter is entitled to priority, since it is only a revised version of a trademark that has been used for nearly fifty years. It is the second user's responsibility to avoid confusion in its choice of a trademark, and that responsibility includes choosing a trademark whose salient portion would not likely be confused with the first user's trademark. *See America v. Forum, Ltd.*, 903 F.2d 434, 440 (7th Cir. 1990). Thus, as founder and CEO of Master Clean, Donald Kessler should have chosen a name for his business that would not be confused with *ServiceMASTER*. Mr. Kessler was employed by a carpet cleaning company in Columbus, Ohio for two years prior to starting Master Clean, and admitted that he examined the competition before opening his business in 1989. Although he first denied it, Mr. Kessler later acknowledged that he was aware of *ServiceMASTER* prior to founding Master Clean. The responsibility for any confusion that exists between these two service marks lies with Plaintiff, not Defendant.

### 2. Likelihood of Confusion

Even if the tacking rule is not applied, Plaintiff's claims are still likely to fail because Master Clean cannot demonstrate a likelihood of confusion. Whether there is likelihood of confusion in a trademark infringement action under the Lanham Act depends on consideration of the following factors: (1) the strength of plaintiff's mark; (2) the relatedness of the services; (3) the similarity of the marks; (4) evidence of actual confusion; (5) the marketing channels used; (6) the likely degree of purchaser care; (7) the defendant's intent in selecting the mark; and (8) the likelihood of expansion of product lines. *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1186 (6th Cir.1988) (citation omitted). These factors are simply a guide to help determine whether confusion would be likely to result from simultaneous use of the two contested marks. *Id.* They imply no mathematical precision, and a plaintiff need not show that all, or even most, of the factors listed are present in any particular case to be successful. *Id.* The general concept underlying likelihood of confusion is that the public believe that the mark's owner sponsored or otherwise approved of the use of the trademark. *Id.*

### a. Strength of Mark

■ The first factor to be examined in gauging the likelihood of confusion is the strength of Plaintiff's mark. A term for which trademark protection is claimed will fit somewhere in a spectrum that ranges from (1) generic or common descriptive, to (2) merely descriptive, to (3) suggestive, to (4) arbitrary or fanciful. *Champions Golf Club, Inc. v. Champions Golf Club*, 78 F.3d 1111, 1117 (6th Cir.1996) (citation omitted). In this case, Plaintiff's mark falls squarely within the "descriptive" category. Mr. Kessler testified that part of his thought process in choosing his company's name was to suggest "masters of cleaning." Mr. Kessler stated that the term "MASTER" denoted a level of quality, and admitted that the word *"CLEAN"* describes his business and is used by thousands of similar cleaning companies for the same reason. Plaintiff applied for but could not obtain a federal registration for his trademark in 1995. Mr. Kessler learned that dozens of companies were also using the name MASTER *CLEAN*, or derivations thereof, in connection with carpet cleaning services. Yet, despite the fact that MASTER *CLEAN* could not be registered on either a state of federal level and that various other companies were using the name elsewhere, Plaintiff continued to use and promote the MASTER *CLEAN* name.

In addition to being intrinsically weak, any alleged strength of Plaintiff's MASTER *CLEAN* mark is further diluted by widespread third-party use.[3] An internet search of telephone listings and online advertisements conducted by Defendant revealed that dozens of companies, in Ohio and across the United States, use the mark MASTER *CLEAN* or some slight variation thereof (such as Master Kleen or Clean Master) in connection with commercial and residential cleaning services. The extent of third-party use is probative evidence that those third parties and the public consider MASTER *CLEAN* to be descriptive and weak. *See, e.g., Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100, 1108 (6th Cir.1991) ("Indeed, courts have found extensive third-party use of a trademark to substantially weaken the strength of a mark.") (citation omitted).

### b. Relatedness of Services

■ The second factor to be examined in assessing the likelihood of confusion is the relatedness of services. Here, Plaintiff and Defendant currently offer similar services in the Central Ohio area. When Mr. Kessler began Master Clean in 1989, however, he only performed carpet and rug cleaning. Defendant and its franchisees have been performing carpet and rug cleaning, along with upholstery cleaning, janitorial services, and fire and water restoration, since before 1989.

Only in 1993, after Mr. Kessler hired a former *ServiceMASTER* franchisee, did Plaintiff begin also offering janitorial work and fire restoration. Mr. Kessler testified that he plans to expand Service Master and offer additional services traditionally provided by *Service MASTER Clean* and its franchisees. Plaintiff has offered no evidence to demonstrate that any confusion between the two marks is not the result of Master Clean's evolving product line.

### c. Similarity of the Marks

■ The third factor the Court considers in determining the likelihood of confusion is the similarity of the marks. In this case, the marks of Plaintiff and Defendant are similar in some respects and quite dissimilar in others. Interestingly, Plaintiff's mark incorporates italics and two different font styles in the same manner as Defendant's long-standing *ServiceMASTER* mark. And the font style of the word "MASTER" in Plaintiff's mark is almost identical to the font style of the word "MASTER" in Defendant's mark.

Yet, as evidenced by the three commercial advertisements displayed at the preliminary injunction hearing, the style and visual presentation between the two marks is quite different. Plaintiff's MASTER *CLEAN* ads feature a saxophone in the background, "talking head" narratives, split screens, and the simultaneous use of black and white and color. Master Clean commercials also use customer testimonials and end with a shot of Master Clean's signature red van and Mr. Kessler thanking Central Ohio for its vote of confidence. Defendant's ads, by contrast, do not employ music voice-over or customer testimonials, and feature *ServiceMASTER Clean*'s distinctive and federally registered yellow van. Finally, Plaintiff's commercials all include the phrase "Maaaaaaster Clean" in a whispery voice,

---

**3.** As Professor McCarthy states: "A mark that is hemmed in on all sides by similar marks on similar goods cannot be very 'distinctive.' It is merely one of a crowd of marks. In such a crowd, customers will not be likely to be confused between any two of the crowd and may have learned to carefully pick out one from the other." *See McCarthy on Trademarks & Unfair Competition* § 11:85 (4th ed.1998).

**828**

while Defendant's ads contain no such auditory signature.

### d. Evidence of Actual Confusion

■ Evidence of actual confusion is the fourth factor considered in determining the likelihood of confusion. Plaintiff claims that the likelihood of confusion is substantial. Master Clean asserts that it has received more than twenty telephone calls from confused consumers and customers wanting to know whether MASTER *CLEAN* and *ServiceMASTER Clean* are the same company, and has received at least one check written to "Service Master Clean" for services that Master Clean rendered. Despite Plaintiff's contention, the great weight of the evidence received to date suggests to the Court that there has been very little, if any, actual confusion.

First, as the Sixth Circuit observed, an "owner of a trademark is not entitled to a guarantee against confusion in the minds of careless and indifferent buyers, and merely occasional cases of confusion or thoughtless errors by very inattentive purchasers are of very little significance in trademark and unfair competition cases." *S.C. Johnson & Son, Inc. v. Johnson*, 266 F.2d 129, 141 (6th Cir.1959) (citation omitted). And, "isolated instances of actual confusion after a significant period of time of concurrent sales or extensive advertising do not always indicate an increased likelihood of confusion and may even suggest the opposite." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 284 (6th Cir.1997). Furthermore, as Professor McCarthy states:

Evidence of the number of instances of actual confusion must be placed against the background of the number of opportunities for confusion before one can make an informed decision as to the weight to be given to the evidence. If there is a very large volume of contacts or transactions which could give rise to confusion and there is only a handful of instances of actual confusion, the evidence of actual confusion may be disregarded as de minimis.

McCarthy on Trademarks § 23:14.

Mr. Kessler stated in his deposition that more than twenty telephone calls from confused customers were received over a period of approximately four months, from February through June 2001.[4] Plaintiff claims that it received an average of more than one call per week from confused customers during the time period it monitored the issue.[5] Mr. Kessler stated that his office books between 550 and 650 jobs each week; Plaintiff, therefore, receives at least that many calls in any given week. Even assuming Plaintiff receives an average of 550 calls and two confused inquires per week, the Court finds that only 0.36%—less than one percent—of all calls logged by Plaintiff are from customers supposedly confused by the two marks. Viewed in context, these misplaced phone calls do not support a finding of actual confusion, nor does one mislabeled check out of the thousands Plaintiff receives in the normal course of business.

Although Plaintiff had almost five months to prepare for the preliminary injunction hearing, Plaintiff failed to produce a single witness who was actually confused

4. Plaintiff has only provided notes from thirteen telephone calls since January 2001, instead of the "more than twenty" calls it claims to have received.

5. The Court notes that the phone calls began almost four years after SMC started to use the *ServiceMASTER Clean* mark, and nearly eighteen months after Mr. Kessler testified to first seeing an advertisement using the *ServiceMASTER Clean* mark.

by SMC's use of the *ServiceMASTER Clean* mark. Plaintiff identified Birtho Arnold as an individual who was supposedly confused. Mr. Kessler testified that Mr. Arnold observed a van hit a vehicle belonging to one of Mr. Arnold's neighbors, and that Mr. Arnold thought that it was a *ServiceMASTER Clean* van. Yet, when Mr. Arnold testified and was shown a photograph of a *ServiceMASTER Clean* van, Mr. Arnold was quite certain that the van he observed was not yellow and did not have the *ServiceMASTER Clean* logo on its side.

Plaintiff's only other witness on this issue was Dan Yoder, an employee of Dick Macheter Ford, who claimed that his supervisor called *ServiceMASTER Clean* when he actually meant to contact MASTER *CLEAN*.[6] Curiously, Plaintiff chose not to subpoena the employer who had firsthand knowledge of the call, but rather Mr. Yoder who did not have firsthand knowledge of this event. Indeed, Mr. Yoder testified that he was not present when his supervisor called to have his carpets cleaned. Mr. Yoder did not know what number his supervisor called, or whether he looked in the white pages or the yellow pages for the listing. Although Mr. Yoder testified that he saw an invoice for *ServiceMASTER Clean*, he was unable to produce the invoice at the hearing, despite being subpoenaed. Moreover, Mr. Yoder stated that he was not confused and knew the difference between MASTER *CLEAN* and *ServiceMASTER Clean*.

Further weakening Plaintiff's argument of actual confusion, Mr. Kessler testified that he has no firsthand knowledge of any customer calling a *ServiceMASTER* franchisee and scheduling any work to be done with the customer thinking that they were calling Master Clean. And Mr. Kessler admitted that he has no evidence that Plaintiff has lost any sales or business as a result of the alleged confusion. In fact, Plaintiff's sales have increased 10%—30% per year since Master Clean was started— even after SMC began using the *ServiceMASTER Clean* mark.

Defendant cites the testimony of Bradley Smith, a *ServiceMASTER Clean* franchisee operating in Columbus, to demonstrate that any confusion that does exist is nothing new. During Mr. Smith's deposition, Mr. Smith was asked if he was aware of any confusion in the marketplace due to these two marks. Mr. Smith responded:

> Probably since Master Clean has been in business, we have been in business a lot longer than they have. I would guess maybe once every month or so, and this was before the *ServiceMASTER Clean* logo came out, we would get a call saying, 'Are you associated with Master Clean?' or 'Is this Master Clean?' or something.

When asked if the frequency of such calls increased since SMC added *"Clean"* to its name, Mr. Smith stated: "I don't think the situation has changed; either gotten worse or better." Mr. Smith also testified that he has been getting calls from people seemingly confused about the difference between *ServiceMASTER* and Serv Pro, another cleaning service, for more than twenty years, further illustrating customer "carelessness" or confusion between such companies that has always existed in the marketplace.

### e. Marketing Channels Used

█ The fifth element of the *Wynn* test that the Court considers to assess the

---

6. It should be noted that Mr. Yoder acknowledged that he has four or five friends who work for Plaintiff.

likelihood of confusion is the marketing channels used by the parties. The Court finds that Plaintiff and Defendant use largely different marketing channels to advertise their products and services. While they both run television commercials, their advertisements do not run on the same channels at the same time, and, unlike Plaintiff, Defendant does not run ads during the entire year. Plaintiff is more dependent on the yellow pages, coupons, and direct mail advertising, whereas Defendant relies primarily on personal referrals and relationship marketing.[7] Finally, Defendant franchisees, Brad Smith and Patrick Marshall, testified that they did not solicit residential carpet cleaning in Columbus, which is one of Plaintiff's major marketing strategies.

### f. Likely Degree of Purchase or Care

■ The likely degree of purchase or care that consumers exhibit in the marketplace is the sixth factor the Court examines in determining the likelihood of confusion. The Court finds that purchasers do not exercise a great deal of care in selecting a carpet cleaner. As Mr. Kessler admitted, carpet cleaners are often impulse buyers who tend to call the first company listed in the phone book or coupon magazine. Additionally, he stated that there are typically eight to ten different companies running coupon ads at any given time. The evidence suggests that customers do not necessarily display significant brand loyalty towards carpet cleaners.

### g. Defendant's Intent in Selecting Mark

■ The seventh factor the Court considers to gauge the likelihood of confusion is the Defendant's intent in selecting its

mark. In this case, Plaintiff has not offered any evidence to suggest that Defendant selected its *ServiceMASTER Clean* mark with the intent of infringing on Plaintiff's mark. Defendant added the word *"Clean"* to its long-established *ServiceMASTER* mark to distinguish better SMC's professional cleaning services and franchise systems from its other expanding service groups, such as its home health care, lawn care, and food management groups. At the time, SMC's outside counsel conducted a full search of state and federal trademarks to determine the availability of the mark. When no bar to registration was found, SMC filed two applications for the word mark in 1997. After the Patent and Trademark Office found no bar to registration, and in the absence of opposition, registrations for the word mark were issued. There was no need for Defendant to search for the name "MASTER CLEAN," as SMC intended to use its primary *ServiceMASTER* mark with *"Clean"* as a descriptive term. The Court finds that Defendant's intentions in selecting its mark were unsullied.

### h. Likelihood of Expansion of the Product Lines

The final factor considered in determining the probability of confusion is the likelihood of expansion of the product lines. There is no evidence to suggest that Defendant has or will expand its product lines into areas offered by Plaintiff. In fact, just the opposite has occurred. By offering janitorial and fire restoration services, Master Clean has expanded its product line into an area traditionally offered by SMC. Mr. Kessler testified that he has expanded the scope of his activities to include hotel properties in Cleveland and

---

**7.** Brad Smith was the only *ServiceMASTER* franchisee to have displayed an ad in the yellow pages. But his ad was under the "ja-

nitorial services" section and did not use the *ServiceMASTER Clean* name or design mark.

plans to service large disaster projects nationally, as SMC now does.

In considering the eight factors set forth by the Sixth Circuit in *Wynn,* the Court finds that Plaintiff has failed to demonstrate a likelihood of confusion as a result of the marks at issue: (1) Plaintiff's mark is weak and merely descriptive; (2) Plaintiff and Defendant offer related services, but that was not always the case; (3) the marks are similar in some respects and dissimilar in others; (4) there is little, if any, evidence of actual confusion; (5) the parties emphasize different marketing channels; (6) consumers do not generally exercise a great deal of care when selecting cleaning services; (7) Defendant did not intend to infringe on Plaintiff's name in selecting its mark; and (8) Defendant is not likely to expand its product lines into areas offered by Plaintiff.

Thus, even in the absence of the tacking rule, Plaintiff has not shown a likelihood of success on the merits of its claim for trademark infringement and unfair competition under the Lanham Act.

### B. Irreparable Harm

Plaintiff has not shown that Master Clean will suffer irreparable injury in the absence of immediate injunctive relief. Plaintiff claimed that it would demonstrate that it has lost customers and that its reputation and goodwill have suffered in the community as a result of Defendant's actions, yet no such evidence has been offered. To the contrary, Mr. Kessler admitted that he has no evidence that he has lost a single customer as a result of SMC's use of the *ServiceMASTER Clean* mark. Nor did he offer any evidence of loss of reputation or goodwill in the community. Mr. Kessler was unable to produce any market studies of name recognition, any figures of lost sales, or any evidence of customers calling SMC rather than Master Clean when they preferred the latter.

As there is no evidence to suggest that Master Clean will be irreparably harmed in the absence of injunctive relief, the Court finds that Plaintiff has failed to satisfy the second prong of the preliminary injunction standard.

### C. Substantial Harm to Others

Plaintiff ignores the substantial harm that others may suffer if the Court issues a preliminary injunction. An injunction would cause substantial harm to Defendant, because it would require SMC to take affirmative, costly steps to alter its use of its *ServiceMASTER Clean* mark. Defendant and its franchisees adopted this mark more than three years ago, and have since spent more than $1 million publicizing the mark. Due to the national scope of Defendant's advertising, James Wassell testified that an injunction would force SMC to terminate and reconstitute all of its national television, print media, trade publications, and websites. Defendant has several product placement agreements with motion picture and television agencies that would also be affected by an injunction.

Conversely, Plaintiff would not be harmed in the absence of an injunction. Mr. Kessler was unable to provide any evidence to demonstrate that Master Clean has suffered any financial burden or other hardship—besides a handful of misplaced telephone calls—as a result of Defendant's actions to date. As Mr. Kessler stated, Plaintiff currently handles errant phone calls by directing any confused customers to the company of their choice. At most, without an injunction, Plaintiff may expect that less than 1% of its customer inquiries will be made in error—hardly enough of a nuisance to tilt the balance of hardships in its favor.

As an injunction in this case would cause substantial harm to Defendant, the Court

finds that Plaintiff has not demonstrated that the balance of hardships tilts in Plaintiff's favor.

### D. Public Interest

An injunction in this case would not serve the public interest, because there is no credible evidence of trademark infringement or unfair competition. Thus, the Court finds that Plaintiff has not satisfied the final prong of the preliminary injunction standard.

For the reasons stated previously, the Court **DENIES** Plaintiff's Motion for Preliminary and Permanent Injunction.

### IV. MOTION FOR JUDGMENT ON PARTIAL FINDINGS

■ Defendant requests that the Court render a judgment on partial findings, pursuant to Federal Rule of Civil Procedure 52(c)[8], which states:

> If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence. Such a judgment shall be supported by findings of fact and conclusions of law as required by subdivision (a) of this rule.

The Court finds that Defendant's motion is improper for a number of reasons. First, in this case, Defendant's motion was made and denied at a preliminary injunction hearing, rather than during a trial. Second, Plaintiff's Amended Complaint requests a jury trial on these issues, instead

of a bench trial in which the Court typically considers Rule 52(c) motions. Third, as the Court found when it initially denied Defendant's motion, Plaintiff has adduced enough evidence for a reasonable jury to find in its favor at the trial on the merits. Furthermore, Defendant made clear at the outset of the hearing that it did not wish to consolidate the hearing with a full trial on the merits. Although the Court has denied Plaintiff's motion for a preliminary and permanent injunction, it declines to dismiss Plaintiff's Complaint at this time.

Thus, the Court **DENIES** Defendant's Motion for Judgment on Partial Findings Pursuant to Rule 52(c) of the Federal Rules of Civil Procedure.

### V. CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiff's Motion for Preliminary and Permanent Injunction, and **DENIES** Defendants' Motion for Judgment on Partial Findings Pursuant to Rule 52(c) of the Federal Rules of Civil Procedure.

**IT IS SO ORDERED.**

---

8. The Court denied Defendant's Rule 52(c) motion at the close of Plaintiff's case during the preliminary injunction hearing, but allowed Defendant to renew its motion at the close of the evidence.